[Cite as *State v. Johnson*, 2016-Ohio-7937.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 16 JE 0002 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| D'ANDRE L. JOHNSON, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of Common Pleas of Jefferson County, Ohio
Case No. 15 CR 83B

JUDGMENT: Affirmed.

APPEARANCES:

For Plaintiff-Appellee: Atty. Jane Hanlin,
Prosecuting Attorney
Jefferson County Justice Center
16001 State Route 7
Steubenville, Ohio 43952

For Defendant-Appellant: Atty. Aaron Richardson
4110 Sunset Boulevard
Steubenville, Ohio 43952

JUDGES:

Hon. Carol Ann Robb
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated: November 23, 2016

ROBB, J.

**{¶1}** Defendant-Appellant D'Andre L. Johnson appeals from his conviction and sentence entered in Jefferson County Common Pleas Court for felonious assault with an attendant firearm specification and discharge of a firearm over a public road. Appellant received an aggregate sentence of eight years in prison for the convictions. Two arguments are presented in this appeal. First, Appellant argues trial counsel's representation constituted ineffective assistance. He asserts counsel failed to object to the admission of evidence of an AR-15 style assault rifle and to alleged inadmissible hearsay evidence. The failure to lodge objections allegedly prejudiced Appellant. He also argues trial counsel made bizarre and unsubstantiated statements, which also resulted in prejudice. Second, Appellant argues the conviction for discharge of a firearm over a public road is against the manifest weight of the evidence.

**{¶2}** For the reasons expressed below, all arguments lack merit. The conviction and sentence are affirmed.

### Statement of the Facts

**{¶3}** On May 24, 2015 at approximately 2:45 a.m., shots were fired outside Club 106, an after-hours club located at 601 South Street in downtown Steubenville, Ohio. No one was injured during the shooting; however, property damage occurred to multiple vehicles located in the bar's parking lot.

**{¶4}** Patrolman Nate Cline of the Steubenville City Police Department heard gunshots while he was patrolling the downtown area. Tr. 163-164. He immediately alerted his fellow officers by radio and headed toward the South Street area where he believed the shots were fired. Tr. 164-165.

**{¶5}** Patrolman Lance Bickerstaff arrived at the South Street area at the same time as Patrolman Cline. Tr. 165. Patrolman Bickerstaff observed a vehicle northbound on Webster Alley coming from South Street traveling towards Adams Street. Tr. 139. Webster Alley is about a block from Club 106. The vehicle was moving slowly and the headlights were not illuminated. Tr. 139. The Patrolmen activated their overhead lights and stopped the vehicle. Tr. 140, 165.

{¶6}    Three individuals were in this car.  The driver was Kevion Claiborne, the front seat passenger was LeQue Hurst, and the backseat passenger was Appellant.  Tr. 167.  The individuals were removed from the car, and the car was searched.  Tr. 167. During the initial search a box of .380 caliber ammunition was found in the glove box, and a .380 Bersa handgun was found under the rear seat of the vehicle.  Tr. 156-157, 167-168, 170-171, 235.  Patrolman Cline noticed Appellant's left middle finger was injured and had blood dripping from it.  Tr. 174.  He also observed a fresh blood spot on the top of the vehicle's trunk.  Tr. 174.

{¶7}    While the initial search was occurring, a security guard from Club 106, Jeff Jones, informed Patrolman Cline that Appellant shot at him.  Tr. 168, 294.

{¶8}    Sergeant John Lemal was the supervising officer that evening.  He instructed Patrolman Chad Kuhn and Patrolman Bickerstaff to go to Club 106 and see if there was any evidence of the shooting.  Tr. 144, 202-204.

{¶9}    Patrolman Bickerstaff found a cell phone in the grass across from Club 106. Tr. 144.  He also found three casings on Webster Alley in close proximity to each other – two .380 casings and a single .223 cartridge.  Tr. 145-146.

{¶10} Patrolman Kuhn investigated Club 106's parking lot and discovered vehicles with windows shot out.  Tr. 205.  He noticed two sizes of bullet holes in the vehicles – one larger and one smaller.  Tr. 205.  This indicated different size guns had been used in the shooting; from the bullet hole sizes he believed a handgun and possibly a rifle were used in the shooting.  Tr.  205-207.

{¶11} Patrolman Kuhn returned to Webster Alley and informed the other officers that they should also be looking for a rifle.  Tr. 207.  The officers attempted to search the trunk of the car, but they were initially unable to do so because the trunk latch did not work.  Upon searching the vehicle again Patrolman Kuhn noticed a paracord in the backseat.  Tr. 170.  When the paracord was pulled, the trunk popped open.  Tr. 170.  In the trunk an AR-15 .233 style assault rifle was found.  Tr. 167-168, 170-171.  A spent casing was recovered from the firearm.  Tr. 158.

{¶12} Appellant, Claiborne, and Hurst were separately taken to the Steubenville Police Department where a gunshot residue test was performed.

{¶13} Appellant was indicted for felonious assault in violation R.C. 2903.11(A)(2), a second-degree felony; an attendant firearm specification in violation of R.C. 2941.145; and discharge of a firearm upon or over a public road in violation of R.C. 2923.162(A)(3), (C)(2), a third-degree felony. 7/8/15 Indictment.

{¶14} The case proceeded through discovery and was tried to a jury. At trial, in addition to the above information being provided, testimony from Club 106's owner and Jeff Jones, the security guard, established Appellant was not permitted in Club 106, and when he arrived he was escorted out. Tr. 260-261, 289. Video surveillance of the outside of the club was played for the jury. Tr. 264-270. The video depicted Appellant's ejection and showed shots being fired.

{¶15} Experts from BCI also testified. The expert on gunshot residue testified particles highly indicative of gunshot primer residue were identified on one of the samples from Hurst, one of the samples from Claiborne, and one of the samples from Appellant. Tr. 317-319. "Particles highly indicative of gunshot primer residue" on a person's hands means the individual either discharged a firearm, was in the vicinity of a firearm when it was discharged, or handled an item with gunshot primer residue on it. Tr. 319. A positive gunshot residue result does not eliminate the possibility of other non-firearm sources of exposure. Tr. 319. The expert also testified gunshot residue cannot identify the shooter. Tr. 322.

{¶16} An expert from the firearms department avowed both the handgun and the rifle were operable. Tr. 333-334. Testing was also performed on the casing found at the scene. The expert determined the two .233 casings found were fired from the rifle. Tr. 338-340. He also determined two of the .380 casings found on Webster Alley were fired from the .380 Bersa handgun. Tr. 340-341.

{¶17} A DNA expert also testified. Swabs were taken from the .380 Bersa handgun and the rifle; two swabs were taken from each gun, one from the trigger and one from the handled areas and barrel. Tr. 355-356. Samples were also taken from the .380 caliber magazine. Tr. 356-357. The samples from the rifle were a complex mixture and not suitable for comparison. Tr. 363. The result was the same for the sample from the trigger of the handgun. Tr. 363. As to the sample from the handle area and barrel of the handgun, although this sample was a mixture, it was suitable

for comparison. Testing indicated Appellant was included as a major contributor of that sample. Tr. 364-365. The expert concluded the mixture would only match one in every 29,220,000,000 unrelated individuals. Tr. 365. The expert also testified Hurst and Claiborne were excluded as major contributors of the sample from the handgun's handle area and barrel. Tr. 365. As to the .380 caliber magazine, the data was not sufficient for comparison. Tr. 365.

{¶18} Lastly, a fingerprint expert testified; this expert was the defense's only witness. She indicated latent prints were lifted from the box of .380 ammunition found in the glove box, but the print did not contain sufficient ridge detail for comparison. Tr. 382. She further testified no one requested a fingerprint analysis for the firearms; no one asked for her to attempt to lift prints from the firearms, casings, or live rounds. Tr. 383. However, she also admitted it can be difficult to get fingerprint lifts from firearms. Tr. 383.

{¶19} The jury found Appellant guilty of the charges. 9/30/15 Jury Verdicts. Appellant was sentenced to an aggregate term of eight years. He received five years for felonious assault, three years for the firearm specification, and thirty months for the discharge of a firearm over a public road. 11/20/15 J.E.; 10/27/15 J.E.

{¶20} Appellant did not timely appeal the conviction and sentence. 1/25/16 NOA. However, he did file a motion for leave to file a delayed appeal, which was granted. 1/25/16 Motion; 2/12/16 J.E.

<u>Introduction to the First Three Assignments of Error</u>

{¶21} For the first three assignments of error, Appellant asserts claims of ineffective assistance of counsel. To prove an allegation of ineffective assistance of counsel, the two-prong *Strickland* test must be met. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). First, it must be established that counsel's performance fell below an objective standard of reasonable representation. *Id.* at 687; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Second, it must be shown that defendant was prejudiced by counsel's deficient performance. *Strickland* at 687. Or, in other words, it must be shown that but for counsel's errors the result of the trial would have been different. *Bradley*, at paragraph three of the syllabus. If this court finds either prong fails there is no need

to analyze the remaining prong, because in order for ineffective assistance of counsel to be shown both prongs must be established by the appellant. *State v. Herring*, 7th Dist. No. 06JE8, 2007–Ohio–3174, ¶ 43.

**{¶22}** Appellant bears the burden of proof on the issue of counsel's effectiveness. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In Ohio, a licensed attorney is presumed competent. *Id.* Furthermore, "a defendant is not deprived of effective assistance of counsel when counsel chooses, for strategical reasons, not to pursue every possible trial tactic." *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988).

**{¶23}** With those standards in mind, we turn to the arguments presented.

<u>First Assignment of Error</u>

"Appellant's trial counsel failed to object to the admission of evidence unfairly prejudicial to defendant, specifically an AR-15 style assault rifle, resulting in ineffective assistance of counsel."

**{¶24}** At trial, the .233 caliber AR-15 style assault rifle was admitted into evidence and shown to the jury. Tr. 254, 334. Expert reports were admitted about whether this weapon was operable, whether the casings found at the scene were shot from this weapon, and whether there was any DNA evidence found on this weapon. Tr. 343, 367. The assault rifle was discussed during trial. Likewise, during voir dire questions were asked about assault rifles and AR-15 style assault rifles. Tr. 41, 42, 68, 70-72. Counsel did not object to the questions or the admission of evidence. In fact, counsel asked questions about the assault rifle during trial and voir dire.

**{¶25}** Appellant asserts trial counsel failed to either file a motion in limine or object to the admission of evidence related to the .233 caliber AR-15 style assault rifle. The charges against Appellant were not related to this rifle, and the evidence submitted at trial did not link Appellant to this rifle. The state's theory of the crime was that this was an ambush shooting; Appellant shot at the club with the .380 Bersa, one of his codefendants used the assault rifle, and the other codefendant was the getaway driver. Appellant asserts the discussion of the assault rifle prejudiced him.

**{¶26}** The state argues the failure to object does not amount to ineffective assistance of counsel. It asserts it was permitted to explain the evidence found at the scene, which included the assault rifle. Furthermore, the state claims the conversations about the assault rifle were minimal, and the evidence showed Appellant did not fire the assault rifle. The state also argues the failure to object to the admission of evidence regarding the assault rifle may have been trial strategy. It was Appellant's trial theory that there was more than one shooter on that night, and he was not one of them. He was attempting to blame the shots fired on another individual. Since the assault rifle could not be linked to Appellant and the video showed the presence of another figure, Appellant argued he was not the shooter.

**{¶27}** The state's arguments are persuasive. Counsel's performance was not deficient for failing to object to questions about AR-15 style assault rifles at voir dire, or for failing to object to questions or the admission of evidence concerning the .233 caliber AR-15 style assault rifle found at the scene. The failure to object is not, by itself, enough to sustain a claim for ineffective assistance of counsel. *State v. Conway,* 108 Ohio St.3d 214, 2006–Ohio–791, 842 N.E.2d 996, ¶ 168. Objecting is a tactical decision that ordinarily does not give rise to a claim for ineffective assistance of counsel. *State v. Johnson*, 112 Ohio St.3d 210, 2006–Ohio–6404, 858 N.E.2d 1144, ¶ 139–140. An appellate court will not second-guess tactical decisions. *State v. Brown*, 7th Dist. No. 12-MA-118, 2015-Ohio-793, ¶ 8.

**{¶28}** In looking at the voir dire as a whole, there were minimal questions or references to AR-15 style assault rifles. The transcript of the voir dire is 91 pages in length. Tr. 8-99. An AR-15 style assault rifle is mentioned on only 6 of those pages.

**{¶29}** A prospective juror was the first person to mention an AR-15 style assault rifle. Tr. 41. The state was asking prospective jurors if any of them own guns or have knowledge of firearms. That question is permissible given that this case involves a shooting. In response to the question, one prospective juror stated he owned an AR-15, two pistols, two shotguns, and a few rifles. Tr. 41. It was at that point the state asked about the AR-15. Tr. 41. After a short dialog, the state asked if the juror would ever see a need for that type of gun to be inside the city limits or near a bar. Tr. 41. The juror responded he did not believe a pistol or any firearm should

be in a bar "for any reason whatsoever." Tr. 42. The state then asked, "To say nothing of an assault rifle?" Tr. 42. To which the prospective juror responded, "Exactly." Tr. 42. The conversation concerning assault rifles ended at that point. This prospective juror was excused from service; the state elected to use its first preemptory challenge to remove him from the jury. Tr. 80.

{¶30} The conversation described above was one of the two instances during voir dire where feelings about an AR-15 style assault rifle were discussed. The second conversation started with defense counsel stating that the case involved a Bersa Thunder .380 and an AR-15 assault rifle. Defense counsel asked if anyone had a problem with either of those guns. Tr. 68. One prospective juror asked why a "big gun like that" was in the car. Tr. 69. The prospective juror indicated it bothered her that a gun like that was in the car because it is an assault rifle. Tr. 69, 71. This prospective juror was also dismissed; defense counsel elected to use its first peremptory challenge to remove her from the jury. Tr. 87.

{¶31} Although our review of the voir dire focuses on these two specific conversations, when the transcript of the voir dire is examined in its entirety, it is clear the focus of the voir dire was not on assault rifles. A review of the entire voir dire reveals that these two conversations were minimal. The primary and proper focus of the voir dire was to determine if the jurors would be fair and impartial.

{¶32} During trial, the focus was also not on the assault rifle, but rather the facts of the case. It would have been difficult to lay out the case without referencing the assault rifle. The officers found two different casings at the crime scene. The size of the bullet holes at the crime scene were two different sizes, and the property damage inflicted was at varying degrees depending on which size bullet hit the property. Also, Appellant was a passenger in the car where the two guns were found.

{¶33} It is acknowledged that the state's theory was Appellant and his two codefendants ambushed the club. One codefendant was the getaway driver, one codefendant used the assault rifle, and Appellant used the .380 caliber Bersa handgun. Despite the fact that the state was not claiming Appellant fired the assault rifle, it was displayed for the jury. Tr. 334-335. There was also discussion about

whether it was operable and whether Appellant's DNA was found on it. There is a potential for prejudice to result from the admission of an unrelated assault rifle. *See State v. Rogers*, 8th Dist. No. 58557, 1991 WL 97395, (June 6, 1991) (evidence of unrelated weapon admitted at trial was prejudicial). However, this weapon was related to the crime and thus, was relevant. Furthermore, as the state points out, it could have elected to contend Appellant aided and abetted his co-defendant in the firing of the assault rifle.

**{¶34}** Additionally, it may have been trial strategy to allow the admission of the AR-15 style assault rifle. Appellant's theory at trial was there was more than one shooter and he was not either of them. Since the assault rifle could not be linked to Appellant through DNA or fingerprints, and the video surveillance allegedly showed the presence of another figure, Appellant argued he was not the shooter. As stated above, we will not second guess trial strategy.

**{¶35}** Consequently, for these reasons counsel's performance did not fall below an objective standard of reasonable representation.

**{¶36}** However, even if it did, Appellant cannot meet the prejudice prong of the *Strickland* test. He cannot show that but for counsel's errors the result of the trial would have been different.

**{¶37}** Appellant was convicted of felonious assault in violation of R.C. 2903.11(A)(2) and an attendant firearm specification. Under that section a person commits felonious assault if he knowingly causes or attempts to cause physical harm to another by means of a deadly weapon. He was also convicted of discharge of a firearm over a public road in violation of R.C. 2923.162 (A)(3) and (C)(2). If a person does discharge a firearm over a public road, and creates a substantial risk of physical harm to any person or caused serious physical harm to property, the violation is a third-degree felony. R.C. 2923.162(C)(2).

**{¶38}** The evidence at trial did not link Appellant to the assault rifle, but it did link him to the .380 caliber Bersa handgun. The .380 caliber Bersa handgun was found under the backseat of the car where Appellant was sitting. Tr. 170-171. Appellant was included as a major contributor to the DNA found on the handle area and barrel of that gun. Tr. 364. Casings found on Webster Alley were determined to

have been shot from the .380 caliber Bersa.  Gunshot residue was also found on Appellant's hands. Tr. 319.  Furthermore, Jeff Jones testified Appellant shot at him, and he told the officers at the scene Appellant shot at him.  Tr. 292, 294, 297.  Officer Cline and Lieutenant Lemal confirmed that while they were at the scene investigating the crime, Jeff Jones told them Appellant shot at him.  Tr. 168, 187, 244.

**{¶39}** This evidence demonstrates felonious assault in violation of R.C. 2903.11(A)(2) and the attendant firearm specification.  The evidence also establishes discharge of a firearm over a public road creating a substantial risk of physical harm to any person and caused serious physical harm to property.  As will be discussed in the fourth assignment of error, there was evidence the shots were fired over Sixth Street, a public road.  Tr. 242.  Jeff Jones' testimony established he was shot at, and the officers testified windows in the vehicles in Club 106's parking lot were shot out.  Tr. 169-170, 205, 292.

**{¶40}** Considering the evidence, Appellant was not prejudiced by the alleged deficient performance.  The result of the trial would not have been different given the evidence.

**{¶41}** This assignment of error is meritless.

Second Assignment of Error

"Appellant's trial counsel failed to object to inadmissible hearsay evidence, resulting in ineffective assistance of counsel."

**{¶42}** At trial, Patrolman Nate Cline testified Jeff Jones identified Appellant as the shooter:

Q.  The officer alerted you what he found; is that right?

A.  Officer Bickerstaff alerted me that he found the magazine to a .380 in the front area and then I had a male who was working security walk up and say the Defendant – he had said "That guy you just put in your car, he just shot at me."

Q.  Okay.  So, you learned that immediately when you were at the scene.

* * *

Q. All right. And when you're there the security guard immediately approaches you and identifies –

A. Right.

Q. – this particular Defendant.

A. He's in walking distance from the Club 106, yes.

Q. As the individual who shot at him.

A. Right.

Tr. 168-169.

{¶43} Sergeant Lemal also testified that Jeff Jones identified Appellant as the shooter:

Q. Okay. So, it's so soon after the shooting that everybody has not even yet been removed from the car at that point.

A. Right.

Q. All right. And did Mr. Jones share any information with you at that point?

A. He did. He advised that the backseat passenger fired – he observed him firing rounds at him.

Q. All right. And the backseat passenger in this case was who?

A. Mr. Johnson.

Tr. 244.

{¶44} Trial counsel did not object to the above testimony. Appellant asserts the failure to object to impermissible hearsay resulted in ineffective assistance of counsel. He claims this testimony was used to bolster Jeff Jones' testimony identifying Appellant as the shooter.

{¶45} At trial Jeff Jones testified:

Q. Okay. And what happened?

A. Once he got outside the club he was on the ground trying to help him up and the other guys I guess was – there was another guy out there. He gets up and then he started running and he started shooting.

Q. And when you say he gets up are you referring to D'Andre Johnson?

A. Yes.

Q. Did you actually see him fire a weapon at you?

A. Yes.

Q. As you sit here today is there any doubt in your mind that the person that you threw out of the club or the person that fired at you is D'Andre Johnson? Is there any doubt at all in your mind that that's who was shooting at you?

A. That's who was shooting at me.

Q. Did you actually see a firearm in his hand?

A. Yes, I did.

Q. Okay. And he was outside of the club at that point?

A. Yes.

* * *

Q. And did you tell the officers at that point who the person was that shot you?

A. Yes, I did.

Tr. 292, 294.

{¶46} Although counsel did not object to the officers' testimony, as explained above the failure to object is not, by itself, enough to sustain a claim for ineffective assistance of counsel. *State v. Conway,* 108 Ohio St.3d 214, 2006–Ohio–791, 842

N.E.2d 996, ¶ 168. Objecting is a tactical decision. *State v. Johnson*, 112 Ohio St.3d 210, 2006–Ohio–6404, 858 N.E.2d 1144, ¶ 139–140.

**{¶47}** Given the facts and evidence in this case, Appellant cannot satisfy either prong of the *Strickland* test for ineffective assistance of counsel.

**{¶48}** He cannot establish counsel's performance fell below an objective standard of reasonable representation because the testimony was admissible. Evid.R. 801(D)(1)(c) indicates neither officers' testimony constituted hearsay. That rule provides:

> (D) Statements Which Are Not Hearsay. A statement is not hearsay if:
>
> (1) Prior Statement by Witness. The declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (c) one of identification of a person soon after perceiving the person, if the circumstances demonstrate the reliability of the prior identification.

Evid.R. 801(D)(1)(c).

**{¶49}** This rule is used to allow a third party to testify about a statement, made by a declarant, that identifies a person soon after perceiving him, assuming the circumstances surrounding the identification can demonstrate it was reliable. *State v. Castillo*, 3d Dist. No. 7-14-14, 2015-Ohio-2738, ¶ 21; *State v. Young*, 5th Dist. No. 14CA25, 2015-Ohio-2075, ¶ 41 (The informant was available and testified, subject to cross examination; the out-of-court identification was reliable because the informant was familiar with appellant and positively identified him in the photo array within hours of the crime.).

**{¶50}** Here, the requirements of this rule are established. First, Jeff Jones, the declarant, testified at trial and was subject to cross examination. Tr. 296-301; *State v. White*, 2d Dist. No. 20324, 2005–Ohio–212, ¶ 42 ("[I]dentification testimony is not admissible per Evid.R. 801(D)(1)(c) unless the person who made the out-of-court identification testifies at trial and is subject to cross-examination."). Second, Jeff Jones identified Appellant soon after perceiving Appellant. Patrolman Cline and Sergeant Lemal testified Jeff Jones identified Appellant immediately after the shooting. Tr. 168-169, 244. The testimony established Patrolman Cline heard the

shots fired, and he and Patrolman Bickerstaff stopped Appellant within the vicinity of the shooting only minutes after the shooting. As Patrolman Cline was placing Appellant in his cruiser, Jeff Jones informed Patrolman Cline and Sergeant Lemal Appellant shot at him. Tr. 139, 166, 168-169, 244. The circumstances also demonstrate reliability of the prior identification. The identification happened almost immediately after the shooting. Furthermore, the testimony established Jeff Jones knew of Appellant; he had to eject Appellant from the club because Appellant was not permitted to be there, and the shooting occurred immediately following the ejection. Tr. 287, 288-289, 292.

**{¶51}** However, even if Evid.R. 801(D)(1)(c) was inapplicable, Jeff Jones' statements to the officers would qualify as admissible hearsay under the excited utterance or present sense impression exceptions. A present sense impression is defined as, "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Evid.R. 803(1). An excited utterance is defined as "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). For a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (1) the occurrence of an event startling enough to produce a nervous excitement in the declarant; (2) a statement made while still under the stress of excitement caused by the event; (3) a statement related to the startling event; and (4) the declarant's personal observation of the startling event. *State v. Given*, 7th Dist. No. 15 MA 0108, 2016-Ohio-4746, ¶ 27. The identifying statement to the officers constitutes an excited utterance or a present sense impression. The statement related to Jeff Jones' personal observation of getting shot at, and the statement was made within minutes of the shooting. His identification statements uttered in close proximity to the event are an indication of trustworthiness. *Given* at ¶ 29, citing *State v. Crowley*, 2d Dist. Clark No.2009 CA 65, 2009–Ohio–6689.

**{¶52}** Consequently, for the above stated reasons, there was no basis to object to the testimony.

**{¶53}** The prejudice prong of *Strickland* also fails. Appellant cannot demonstrate he was prejudiced by any deficient performance to object to the alleged hearsay testimony. Jeff Jones and the officers' recitation of Jeff Jones identification was not the only evidence of identity. Appellant was the only backseat passenger in the vehicle. Tr. 171. Under the backseat where he was sitting a .380 Bersa handgun was found. Tr. 170. DNA testing on that handgun indicated he was a major contributor to the DNA found on the handle and barrel. Tr. 364. In fact, that DNA profile would only be expected to be found 1 in 29,220,000,000 unrelated individuals. Tr. 365. Appellant tested positive for having particles highly indicative of gunshot primer residue on his hands. Tr. 319. The .380 casings found at the scene were also examined and it was concluded to a reasonable degree of scientific certainty that those casings had been shot by the .380 Bersa handgun found under the backseat of the vehicle. Tr.338-340. This evidence was sufficient to establish identity. Consequently, it cannot be concluded Appellant was prejudiced by any alleged deficient performance to object to the alleged hearsay testimony.

**{¶54}** This assignment of error is without merit.

<u>Third Assignment of Error</u>

"Appellant's trial counsel made bizzarre [sic] and unsubstantiated statements, which together amounted to ineffective assistance of counsel."

**{¶55}** Appellant claims statements made by trial counsel starting in the opening statement and permeating through trial resulted in ineffective assistance of counsel.

**{¶56}** As to opening statements, there are three statements Appellant argues contributed to counsel's ineffective assistance. The first is counsel's statement that the evidence would show Jeff Jones was shooting at Appellant. This is a mischaracterization of what trial counsel stated. Counsel did not in opening statements indicate Jeff Jones was shooting at Appellant. Rather, counsel stated a security guard was shooting at Appellant. Tr. 131. Counsel acknowledged there was more than one security guard. The testimony confirmed there were two security guards. Tr. 283. Jeff Jones testified that after he removed Appellant from the club someone came out behind him, who he could not identify, and began shooting. Tr.

295. Furthermore, the video surveillance of the club was played for the jury and it appears to show someone with a gun. Tr. 280.

{¶57} The second statement is Appellant was so scared for his life he was "outrunning the bullets." Tr. 131. That statement is a figure of speech, and the common ordinary person understands what is meant by the statement. The statement is not taken to be literal by a reasonable person. Thus, such a statement does not amount to deficient performance.

{¶58} The third alleged statement is DNA evidence from all three individuals would be found on the gun. Similar to the first statement, this is a mischaracterization of what trial counsel said. Trial counsel was attempting to explain why the gunshot residue test for Appellant came back positive, and why his DNA was found on the barrel and not on the trigger. Tr. 134. She indicated Claiborne lived out of his car and kept his gun under the backseat. Appellant was allegedly helping him clean out the backseat and took the gun out by the barrel. Since Claiborne had shot the gun earlier that day, gunshot residue was transferred to Appellant's hands. Tr. 134. Admittedly, there was no evidence at trial to confirm this version of events. However, whether Appellant was going to testify on his own behalf might not have been decided at that point. Had Appellant testified he may have confirmed this version.

{¶59} Appellant next asserts trial counsel made irrelevant inquires during cross-examination and misstated witnesses' answers. Appellant hones in on a discussion with Patrolman Cline on where the .380 Bersa was found. It was found under the backseat of the car. Tr. 188. Counsel asked if it took two officers to lift the seat. Tr. 188. The officer responded they each lifted one side. Tr.188. For clarification she asked:

Q. Okay. So, it did take two of you to lift the seat up?

A. I didn't say that. I said I lifted my side and I think he lifted his separately. I mean, the seat was not picked up and completely removed to my knowledge.

Q. So, if someone was sitting on that seat they couldn't lift it up.

> A. No, you could. I said you could lift it – I lifted my side with the other side being down. He lifted his side with my side being down.

Tr. 188-189.

**{¶60}** The officer's answers about lifting the seat were not clear, therefore, counsel was attempting to clarify what was needed to lift the seat. Also, given the questions it appears the defense was asserting Appellant could not have lifted the seat while he was sitting on it. While the questioning was not effective to get the response counsel wanted, it may have been effective in getting the jurors to think about whether it was possible. During closing, trial counsel stated Appellant could not have lifted the seat while he was sitting on it to place the gun under it because it took two policemen to lift the seat. Tr. 409.

**{¶61}** Appellant also points to the prosecutor's statements at the beginning of the state's closing argument to demonstrate defense counsel made bizarre or unsubstantiated statements during trial. The first statement the prosecutor made was, "There are times when I wonder at the end of a trial whether Defense Counsel and I have been in the same room to hear the same testimony." Tr. 411. This statement was directed at all defense counsel, not just this defense counsel. Furthermore, this statement highlights what goes on at trial. Each side looks at the evidence differently and wants the jury to look at the evidence in a way that is most favorable to their respective position. For instance with the seat of the car defense, counsel was of the opinion that Appellant could not be sitting on the backseat and still have the ability to lift it to put the gun under it. The state, on the other hand, thought the officer was believable that one could lift it while sitting on it. Another example is the results from the DNA testing. Defense counsel on cross examination asked the DNA expert if her calculation of the odds of the DNA found on the barrel of the handgun was similar to the flip of a coin:

> Q. Okay. Now, I know we're getting a little bit technical here but I kind of want – I kind of want to break it down where we can understand it a little bit better. Now, if we have 15, when you do your calculation it's like doing a coin toss; right? One – if you flip a coin for heads or tails,

you have 1 out of 2 chances.  If you flip it again, its 1 out of 4.  If you flip it again, it's 1 out of 8.

A.  1 out of 16.

Q.  1 out of 16, right.  2, 4, 16.

A.  Uh-huh.

Q.  Same thing with your numbers that you do with the reporting that you do here; correct?

A.  It's a similar theory but the odds – it's not 1 in 2 because it's – there's multiple numbers that you can get.  It's not just heads or tails and so but it's similar.  It's a good analogy for it but the frequencies for the pieces of DNA are different and it's – it's additive.  It's multiplied, kind of like what you're saying.

Q.  Okay.  So, it's like chance.

* * *

A.  Well, it's – it's – it's an estimate based on the frequencies that are known, so that the profile as a whole is the estimate at each location multiplied across the board for the profile.

Tr. 371-372.

During closing, trial counsel made the following argument:

He's not guilty.  1 in 29 billion, 200 million (29,200,000,000).  The expert said the use of a coin flip was a good analogy.  Chance, odds, estimate, that's reasonable doubt and I ask you to vote just that way, not guilty on both counts and the specification. Thank you.

Tr. 411.

{¶62}  The state then rebutted and argued the expert did not compare it to a flip of the coin; the odds were 1 in 29 billion.  Tr. 412.

{¶63} This demonstrates each side viewing the evidence differently and trying to convey it in a way that is most favorable to their respective positions.

{¶64} Although counsel's arguments concerning the seat of the car and the results of the DNA testing may not have been very compelling, overall it cannot be found trial counsel's arguments and statements resulted in ineffective assistance of counsel. Defense counsel filed a number of pre-trial motions. During trial, she cross-examined officers on the lack of placement placards at the scene and the lack of testing done on the blood found on the trunk of the car. Tr. 152-153, 189. She cross-examined the gunshot residue expert about transference of gunshot residue prior to testing that may have caused Appellant to test positive for gunshot residue. She also had the expert admit a positive gunshot residue test cannot identify the shooter. Tr. 322. Defense counsel also brought to light that the state did not request DNA testing on the bullets. As to the DNA expert, defense counsel's cross-examination resulted in the DNA expert testifying that the 1 in 29,200,000,000 figure was to unrelated individuals. Tr. 368. The expert also admitted the DNA results do not necessarily mean Appellant fired the gun. Tr. 373. Defense counsel called a fingerprint expert from BCI. That expert testified the state did not request fingerprint analysis for guns, magazines, or shell casings. Tr. 382-383. As to the prints that were lifted from other objects, the ridge detail was not sufficient for comparison. Tr. 382. Defendant's Exhibit K. Furthermore, of the prints that were lifted and could be compared, they did not match Appellant's fingerprints. Tr. 386; Defendant's Exhibit K.

{¶65} Consequently, the actions taken by counsel show competent representation; Appellant has failed to overcome the presumption. However, even if Appellant could establish counsel's representation fell below an objective standard of reasonableness, given the evidence submitted Appellant cannot show prejudice. As stated above, Jeff Jones identified Appellant as the shooter. Tr. 294. Appellant was the only backseat passenger in the vehicle. Tr. 171. Under the backseat where he was sitting a .380 Bersa handgun was found. Tr. 170. DNA testing on that handgun indicated he was major contributor to the DNA found on the handle and barrel. Tr. 364. In fact, that DNA profile would only be expected to be found 1 in

29,220,000,000 unrelated individuals. Tr. 365. Appellant tested positive for having particles highly indicative of gunshot primer residue on his hands. Tr. 319. The .380 casings found at the scene were also examined, and it was concluded to a reasonable degree of scientific certainty that those casings had been shot by the .380 Bersa handgun found under the backseat of the vehicle. Tr.338-340. This evidence supports the conviction for felonious assault and the attendant firearm specification.

{¶66} For those reasons, this assignment of error is meritless.

### Fourth Assignment of Error

"Appellant's conviction on count three of the indictment was against the manifest weight of the evidence."

{¶67} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id.* In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

{¶68} Granting a new trial is only appropriate in extraordinary cases where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of fact who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶69} Appellant asserts his conviction for discharging a weapon over a public road in violation of R.C. 2923.162 is against the manifest weight of the evidence. That statute in pertinent part states:

(A) No person shall do any of the following:

* * *

(3) Discharge a firearm upon or over a public road or highway.

* * *

(C) Whoever violates this section is guilty of discharge of a firearm on or near prohibited premises. * * * A violation of division (A)(3) of this section shall be punished as follows:

* * *

(2) Except as otherwise provided in division (C)(3) or (4) of this section, if the violation created a substantial risk of physical harm to any person or caused serious physical harm to property, a violation of division (A)(3) of this section is a felony of the third degree.

R.C. 2923.162(A)(3)(C)(2).

{¶70} Patrolman Bickerstaff testified he found .380 caliber casings on Webster Alley. Tr. 144-145. Appellant was the only backseat passenger of the car that was stopped immediately following the shooting. Tr. 171. A .380 caliber Bersa handgun was found under the backseat of that car. Tr. 170, 172. That firearm was submitted to BCI for testing. The firearms expert testified those casings were fired from that firearm. Tr. 340-341. DNA testing was also performed on the .380 caliber Bersa handgun. The results indicated Appellant was a major contributor to the DNA found on the gun. Tr. 364. That DNA mixture would only be found in 1 in 29,220,000,000 unrelated individuals. Tr. 365. Jeff Jones also testified Appellant shot at him. Tr. 292.

{¶71} Sergeant Lemal testified Sixth Street in Steubenville, Ohio, is a public street. Tr. 240. Patrolman Kuhn testified he observed significant damage to vehicles

in the parking lot for Club 106. Tr. 205-207. He explained the bullet paths and stated the bullets were traveling west. Tr. 216. The following colloquy then occurred:

Q. Okay. And the van, if I understand your testimony, was closest to that side entrance; correct?

A. It was, yes.

Q. Do you recall being asked could the shooter have been shooting from this way and still hit these car windows?

A. Right. That's – that was when I said no definitely.

Q. Okay. And why is that?

A. Well, the van and then you have the building, you have the can –

Q. Okay.

A. – and the van is much taller and the cars are behind it , so.

Q. All right. So, if our shooter had been coming – that had done all this damage was coming from that side door and shot at the van, you wouldn't see the same kind of damage you saw if our shooter was coming from south – from Webster Alley, from South Street and shooting towards the club.

A. No, you would not.

Tr. 228.

{¶72} The testimony and evidence indicate Appellant was one of the shooters. All the testimony taken together indicates the shots were fired over Sixth Street, a public road. Admittedly, the testimony concerning whether shots were fired over Sixth Street could have been clearer. For example, an officer could have testified more concisely that given the bullet path the shots were fired over Sixth Street. That said, there was a jury view of the scene. While the cold record in this case might not clearly indicate where Webster Alley is in relation to Sixth Street and

Club 106, and where the parking lot is located in relation to Sixth Street and Webster Alley, the jury got to view the location. Therefore, when the officers were testifying about the location of casings and parking lots, the jury could clearly picture the event as laid out by the state. The jury was in the best position to determine whether the shots were fired over Sixth Street, given the jury view of the scene.

**{¶73}** For those reasons, the jury did not clearly lose its way and the conviction for discharge of a firearm over a public road is not against the manifest weight of the evidence. This assignment of error is without merit.

## Conclusion

**{¶74}** All four assignments of error lack merit. Appellant's conviction and sentence is hereby affirmed.

Waite, J., concurs.

DeGenaro, J., concurs.