[Cite as *State v. Farraj*, 2025-Ohio-2778.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 114669 |
| v. | : | |
| SAMI FARRAJ, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 7, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-690100-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and James B. Flanagan, Assistant Prosecuting Attorney, *for appellee*.

James J. Hofelich, *for appellant*.

WILLIAM A. KLATT, J.:

{¶ 1} Defendant-appellant Sami Farraj ("Farraj") appeals from his convictions for burglary and trespass following a jury trial. For the following reasons, we affirm.

**Factual and Procedural History**

{¶ 2} On March 25, 2024, a Cuyahoga County Grand Jury indicted Farraj on Count 1, burglary in violation of R.C. 2911.12(A)(1); Count 2, burglary in violation of R.C. 2911.12(A)(2); and Count 3, trespass in a habitation when a person is present or likely to be present in violation of R.C. 2911.12(B). These charges arose from a March 8, 2024 incident that took place in Fairview Park, Ohio.

{¶ 3} Farraj initially pleaded not guilty to all charges. The case proceeded to a jury trial on September 25, 2024.

{¶ 4} The State called Erin Slovenkay ("Slovenkay"), who testified that she lived on Lorain Road in Fairview Park with her husband Robert Micheletto ("Micheletto") and their two young children. Slovenkay testified that on the night of March 8, 2024, she and Micheletto got a babysitter because they went to a Cavaliers basketball game.

{¶ 5} Slovenkay testified that while she was at the game, she received a call from the babysitter, Elizabeth Sonby ("Sonby.") Slovenkay had trouble hearing because of the loud atmosphere, but she could hear the babysitter's voice sounded panicked. Slovenkay went to the restroom in an attempt to hear better, and she learned that a man had invaded her home and the police were there. Slovenkay testified that she learned that her children were safe, but Sonby asked her to come home immediately. Slovenkay and Micheletto were driven home by their friends who also attended the game. When they arrived home, Sonby was still there, along with her parents and brother, and police officers were still on the scene.

**{¶ 6}** Slovenkay said that she spoke with the police and Sonby. She testified that they took a brief inventory of their belongings and saw that their jewelry and computers were still there. The following day, Slovenkay was on her way out of the house to drop off flowers to Sonby's house when she noticed that her coat was not where she had left it in the foyer. Slovenkay described the coat as a brown leather bomber jacket with a wool collar. The State played body-camera footage from the night of the incident, showing a man — later identified as Farraj — holding an item that Slovenkay identified as her missing jacket. Slovenkay testified that she called the police and informed them that her coat was missing.

**{¶ 7}** The State also called Sonby, who testified that March 8, 2024, was her first time babysitting for Slovenkay and her family. At the time, Sonby was 18 years old. Sonby testified that she had met the family and their dog on a previous date. On the night of the incident, Sonby arrived around 7:30 p.m. She testified that she watched a movie with the children, put them to bed in their upstairs bedroom at around 9:30 p.m., and returned downstairs to do her homework.

**{¶ 8}** Sonby testified that she heard the front door open and initially assumed that it was Slovenkay and Micheletto returning home. Sonby testified that the dog did not bark, and she was not initially alarmed. Sonby testified that she saw a hand extend to pet the dog, and then she saw a man inside the front door of the home and realized that the man was not Micheletto. Sonby described the man as wearing all black. According to Sonby, she had not seen the man before, and he had not knocked on the door, rang the doorbell, or said anything when he entered the

home.  Sonby testified that she went to the kitchen, got a knife, and started yelling at the man.

{¶ 9}  According to Sonby, the man looked at her very calmly and said, "[Y]ou don't have to do that." (Tr. 286.)  Sonby then locked herself in the first-floor bathroom and called 911.  The State played the audio of Sonby's 911 call during trial.  Sonby estimated that she was in the bathroom for approximately eight minutes until police responded to the house.

{¶ 10} Sonby testified that while she was on the phone with 911, she sent her mother a text message.  Sonby testified that after the police cleared the house, she went upstairs to check on the children.  The four-year-old child was still sleeping, and Sonby carried the two-year-old child downstairs because she was crying.  Sonby testified that her parents and brother also arrived at the house in response to her text message.  Sonby testified that the police had detained the man down the street and asked her to come outside and identify him.  Sonby stated that she left the children with her mother and went with her father and the police approximately seven houses down the street.  Sonby identified the man police had detained — Farraj — as the man who had entered the house earlier that evening.  At trial, Sonby also identified Farraj as the man who had entered the house.  Sonby testified that she and her father returned to the house and police had her fill out a police report.

{¶ 11} The State also called Fairview Park police officer Ray Titler ("Titler"), who testified that he was working the night shift as a patrol officer on March 8, 2024.  Titler testified that he responded to the home on Lorain Road after Sonby called 911.

Titler testified that upon arrival he observed a man walking east from the vicinity of the home and wearing a black hoodie and jeans. Titler explained that he initially approached the man to question him because he was the only person in the vicinity of the house, but having no reason to detain him, Titler proceeded to the house. Once Titler was in the house, dispatch provided him with a description of the intruder that matched the man he saw walking down the street near the house. Titler testified that he instructed other officers to return to the area where he had seen the man, and Titler and another officer entered the home to make sure that no other suspects were still inside the home.

{¶ 12} Titler and his partner entered the home, announced that they were the police, and proceeded to clear the house, going from room to room and ensuring that no one other than Sonby and the children were in the home. Titler testified that after the home was cleared, Sonby's parents arrived; Titler spoke with them and escorted them inside the house. Titler testified that upon returning outside, he saw the same man he had previously seen in the vicinity of the house and proceeded to detain him. Titler estimated that about 13 minutes passed in the time between initially seeing Farraj in the vicinity of the house and ultimately detaining him. At trial, Titler identified Farraj as the man he arrested on March 8, 2024.

{¶ 13} Titler testified that after he detained Farraj several houses down the street from the scene of the burglary, another officer brought Sonby and her father to identify Farraj.

**{¶ 14}** On cross-examination, Titler testified that he had encountered Farraj earlier in the evening when Farraj was a passenger in a vehicle whose driver was found asleep and arrested for operating a vehicle while intoxicated. Titler testified that Farraj asked him for a ride, but due to a manpower issue the police were unable to provide him with a ride.

**{¶ 15}** The State also called Fairview Park police detective Richard Rutt ("Rutt"). Rutt testified that he was assigned this case on March 10, 2024, the Monday after the incident took place. According to Rutt, Farraj was in custody at that time, having been arrested the night of the incident. Rutt testified that based on his experience and the circumstances of this case — in which the suspect was arrested shortly after the incident — he did not believe it was necessary to take additional photographs of the crime scene or take fingerprints of the front door. Rutt's investigation of the case was largely limited to reviewing the body-camera footage of the responding officers and the witness statements. Beyond that, Rutt's involvement was limited to processing paperwork and processing Farraj to prepare his charges.

**{¶ 16}** At the close of the State's case, Farraj made a Crim.R. 29 motion for acquittal. The court denied this motion. The defense rested without presenting any additional evidence and renewed its Crim.R. 29 motion; the court overruled this motion.

**{¶ 17}** During closing arguments, defense counsel made several statements relevant to the instant appeal. For example, defense counsel stated:

I'm going to tell you, he had the coat. He can't deny that. We have a picture. That's a theft. He's not charged with a theft. He's charged with burglary. He's charged with trespass in a habitation. . . . Now, I'm sure in closing arguments we're going to parse through the moment he put his hand in that doorway to grab the coat. That's — that's burglary. Okay.

(Tr. 401.) Defense counsel also stated: "I will readily admit he took the coat." (Tr. 402.)

{¶ 18} The jury found Farraj not guilty of Count 1, burglary in violation of R.C. 2911.12(A)(1); guilty of Count 2, burglary in violation of R.C. 2911.12(A)(2); and guilty of Count 3, trespass in a habitation where a person is present or likely to be present in violation of R.C. 2911.12(B).

{¶ 19} On October 29, 2024, the court held a sentencing hearing. The assistant prosecuting attorney, defense counsel, Slovenkay, and Farraj all addressed the court. The court sentenced Farraj to three to four and one-half years in prison.

{¶ 20} On December 17, 2024, Farraj filed a motion for delayed appeal, which this court granted. Farraj raises a single assignment of error for our review:

> Appellant received ineffective assistance of counsel when trial counsel repeated[ly] admitted to the crimes charged.

**Law and Analysis**

{¶ 21} In Farraj's sole assignment of error, he argues that he received ineffective assistance of counsel because his trial counsel repeatedly admitted to the crimes charged. Specifically, Farraj argues that his counsel was ineffective for repeatedly admitting that Farraj reached into the entryway of the home and grabbed a coat because this conduct was the subject of the burglary charges. In support of

this argument, Farraj points to statements made by his trial counsel during opening statements, cross-examination of the State's witnesses, and closing arguments.

{¶ 22} The Sixth Amendment of the U.S. Constitution and Article I, Section 10 of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has recognized that "the right to counsel is the right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of counsel, a defendant must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Id.* Our review of ineffective assistance of counsel claims requires us to give great deference to counsel's performance. *Id.* at 689. "A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.).

{¶ 23} Farraj was found guilty of burglary in violation of R.C. 2911.12(A)(2), which provides that

> [n]o person, by force, stealth, or deception, shall . . . [t]respass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense.

Farraj was also found guilty of trespass in a habitation where a person is present or likely to be present in violation of R.C. 2911.12(B), which provides that

> [n]o person, by force, stealth, or deception, shall trespass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present.

Thus, both offenses required the State to prove that Farraj trespassed into the victims' home.

{¶ 24} Farraj argues that when trial counsel repeatedly admitted that Farraj reached his hand into the vestibule or entryway of the home, he was essentially admitting that Farraj committed the offenses with which he was charged.

{¶ 25} For Farraj to establish ineffective assistance of counsel, he must prove both that counsel's performance was deficient and that Farraj was prejudiced by the deficient performance. *Strickland* at 687. We will begin with an analysis of whether Farraj was prejudiced by his counsel's repeated references described above.

{¶ 26} In this case, the evidence presented by the State showed that Farraj entered the victims' home, where he was confronted by their babysitter and ultimately took a coat from the home's entryway. This was established by testimony from the victims and the responding officers, as well as from body-camera footage showing Farraj holding the jacket he had taken from the home. Given this overwhelming evidence, Farraj has not shown that there is a reasonable probability that but for his counsel's statements, the result of the trial would have been different.

Because Farraj is unable to satisfy the second prong of the *Strickland* test, he cannot establish that he received ineffective assistance of counsel.

{¶ 27} Farraj's sole assignment of error is overruled.

{¶ 28} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
WILLIAM A. KLATT, JUDGE*

EILEEN A. GALLAGHER, A.J., and
SEAN C. GALLAGHER, J., CONCUR

(*Sitting by assignment:  William A. Klatt, J., retired, of the Tenth District Court of Appeals.)