[Cite as *State v. Harris*, 2022-Ohio-4630.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 110982 |
| v. | : | |
| MARVIN HARRIS, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 22, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-633664-B

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Brian Kraft and Yasmine M. Hasan, Assistant Prosecuting Attorneys, *for appellee.*

Russell S. Bensing, *for appellant.*

EMANUELLA D. GROVES, J.:

**{¶ 1}** Defendant-appellant Marvin Harris ("Harris") appeals his convictions following a jury trial. For the reasons set forth below, we affirm.

## Procedural and Factual History

{¶ 2} In October 2018, a grand jury indicted Harris and three codefendants, A-mier R. Taylor ("Taylor"), Larissa Harris ("Larissa"), and Darshawn Shields ("Shields"), on aggravated murder, murder, five counts of attempted murder, eight counts of felonious assault, one count of discharge of a firearm on or near prohibited premises, and one count of improperly handling a firearm in a motor vehicle. All counts had one-year firearm specifications attached. All counts except the improperly handling a firearm in a motor vehicle charge had three-year firearm specifications attached.

{¶ 3} In exchange for reduced charges, Taylor, Larissa, and Shields agreed to testify against Harris at trial. Harris pled not guilty at his arraignment; several pretrials were conducted, and the case commenced to a jury trial on August 16, 2021. On the day of the trial, the prosecution informed the court that Larissa, who is Harris' older sister, did not want to maintain her plea agreement. When asked, Larissa initially refused to tell the court whether she would testify and asked that she be assigned a new attorney. After further discussion, Larissa indicated that she would testify but still wanted a new attorney to represent her interests. Larissa did not divulge at that time the content of her testimony.

{¶ 4} Trial began with the testimony of A.B., a local business owner in the Buckeye neighborhood in the city of Cleveland. He testified that on November 24, 2018, the day after Thanksgiving, he had gone to his beauty supply store with his 12-year-old son, A.L.B. and his teenage nephew. A.B. did not typically

bring his children to the store, however, on that day, his wife was out shopping and running errands. Around 7:30 p.m., A.B. heard a loud bang against the glass of his storefront window. When he went out to check what had occurred, A.B. found a group of youths harassing an older gentleman. A.B. told the youths to go away and helped the man to get up. He then glanced toward East 117th Street and noticed two young men standing in a military stance. A.B. saw the two young men start shooting into the crowd of people. He immediately turned and tried to run back into his store. When he turned, he realized that A.L.B. had followed him outside because he saw A.L.B. run into the store ahead of him. A.B. fell and ended up crawling into the store. When A.B. entered the store, his nephew told him that A.L.B. had been shot in the wrist. A.B. went and got his own gun and went outside to make sure everything was safe. When he reentered the store, he realized that A.L.B. was more seriously wounded than was first thought. On removing A.L.B.'s jacket, A.B. found a gunshot wound under A.L.B.'s arm. Although A.B. administered CPR, A.L.B. died from his wounds.

{¶ 5} L.H. was driving down Woodland Avenue, which turns into Buckeye Road, when she saw police cars driving swiftly to the end of the street. As she got closer to the area of East 116th and Buckeye, she saw her son, J.H., laying on the ground. J.H., who was 16 years old at the time, had been shot in the head. L.H. relayed that J.H. was in the hospital for a year and a half after the shooting. At the time of trial, J.H. was unable to use his left side, had left-side blindness, and memory loss, and required assistance with nine out of ten daily living activities.

{¶ 6} Officer James Kertcher with the Cleveland Police Department was one of many officers called to the scene. He made contact with two youths, D.T. and T.M. who had run into a nearby clothing store during the shooting. Both had been shot in their lower extremities. When asked, neither could describe what occurred and indicated that they did not see much. Neither boy testified at trial.

{¶ 7} Officer Robert Farren made contact with two youths who ran into a nearby liquor store, J.B. and his brother, M.B. M.B. had been shot in the buttocks. J.B. testified at trial about M.B.'s injuries.

{¶ 8} Thirty-five-year-old Valonte McCord was driving on Buckeye on November 24, 2018, with his cousin. One minute he was driving and the next thing he knew, his windshield was shattered, and his right eye was bleeding. He was able to drive to the side of the road, at which point, his cousin took over driving and took McCord to University Hospitals. McCord learned at the hospital that his eye was struck by bullet fragments and glass. As a result of his injuries, McCord has trouble focusing and can no longer participate in his previous activities, such as playing basketball and bowling. McCord did not see the shooting or the shooters.

{¶ 9} Shields testified at trial as part of his plea agreement. Shields, who was fifteen at the time of the shooting, agreed to be bound over as an adult and pled guilty to involuntary manslaughter with a one-year firearm specification, five counts of felonious assault, and improper discharge of a firearm over a public road or highway resulting in serious physical harm. In exchange for the reduced plea,

Shields agreed to testify truthfully at trial. The plea deal called for Shields to be sentenced after he testified.

{¶ 10} Shields testified that codefendant Taylor was his best friend, more like a brother. They would see each other every day. At the time, Shields was dating C.T., Taylor's 14-year-old sister. Taylor was dating Larissa, who Shields described as "grown." He didn't know her exact age but knew she was not a teenager. Shields and Taylor, who was also fifteen at the time of the shooting, attended the same school. Shields was also familiar with Larissa's brother Harris; however, he had not known either Larissa or Harris long.

{¶ 11} On the day of the shooting, Taylor called Shields and asked if his mother would allow Taylor to spend the night. Shields was on punishment but told Taylor to come over anyway. Shields's mother was working a double shift, and when she called and learned that Taylor was at the home, she became upset because Shields was not allowed to have company. She told Shields that Taylor had to leave. Shields and Taylor decided to go pick up some marijuana. They called Larissa and asked her for a ride to the Lee Road area. Larissa picked them up in her car, a gold Honda with a missing hub cap. Larissa's brother, Harris, and her infant daughter, Skyla, were also in the car.

{¶ 12} The group drove around, making several stops. At some point, Harris told Taylor to call the guys who shot him. Shields disclosed that there was an earlier incident where someone shot Taylor in the leg. Although Shields was there at the time, he did not know why someone was trying to shoot Taylor. He only knew that

Taylor believed someone from the Buckeye neighborhood was responsible. Shields used to live in the Buckeye neighborhood and was still on good terms with some of the people. Taylor complied with Harris's request and learned that the person Taylor suspected of shooting him was at a liquor store on Buckeye. Larissa drove them to the area and pulled behind a store. Shields got out of the car first, followed by Harris and Taylor. Shields thought that something was going to "go down" but did not know what. He was concerned because Taylor was a hothead and often carried a gun. Shields, on the other hand, would fight someone but claimed that he did not carry a gun and was known not to carry guns.

{¶ 13} Shields looked out first and observed a large group of kids from the Buckeye neighborhood on the street. He turned back and let Taylor and Harris know that there was a big crowd of people, too many for them to start an altercation. The three discussed it and decided to leave. Before they could do so, they were spotted by the other group of teens. At that point, someone gave what Shields called a "hood call." According to Shields, a hood call is a way of asking, "who is that?" or "why are you here?" According to Shields, Taylor saw that as a sign that the Buckeye group was coming for them, and Taylor started shooting. Harris then began shooting at the group as well. Shields denied participating in the shooting, claiming he went back and got in Larissa's car.

{¶ 14} When Shields reentered the car, Larissa had the music up loud like nothing was going on. He did not think she could hear the gunfire, so he told her what was happening. Shields turned the music down so Larissa was able to hear the

shots. According to Shields, Larissa panicked and tried to start the car. Before she could leave, Taylor and Harris got back into the car and Larissa drove off.

{¶ 15} Larissa also testified. She acknowledged that in exchange for a plea to involuntary manslaughter, five counts of attempted murder, a count of felonious assault, a count of improper discharge of a firearm over a public road, and firearm specifications, she agreed to testify truthfully against her younger brother, Harris. However, she stated that she did not want to testify, and only agreed because the prosecutor threatened her with a life sentence if she refused.

{¶ 16} During her testimony, Larissa identified still images of her Honda that put her car in the vicinity of the shooting on November 24, 2018. In response to a number of questions from the prosecution, Larissa indicated that she did not remember what occurred. The state introduced a portion of her video statement into the record to refresh her recollection. The video was played in open court before the jury; however, it was not admitted into evidence. The video statement is not transcribed in the transcript, which reflects "(Video played in the presence of the jury)." The record reflects that the video was stopped at the 11 minute 35 second mark. The defense did not object to the state playing the video in front of the jury.

{¶ 17} Larissa indicated that the video did not refresh her recollection because she lied in that statement and did not remember what she said. Nevertheless, Larissa admitted that in her statement she implicated Harris, Shields, and Taylor in the shooting. However, she stated that she lied to the police because she stayed in her car and didn't see anything.

{¶ 18} When asked what really happened, Larissa testified that she dropped off Harris at the store to pick up something to drink for Skyla. Taylor and Shields got out of the car as well. After Harris got back into the car, Larissa heard gunshots. She testified that Shields had a gun that day, however, she never saw a gun on Taylor. Larissa also acknowledged, however, that she never checked him for a gun.

{¶ 19} Taylor also agreed to testify after pleading to reduced charges of murder with a three-year firearm specification, five counts of attempted murder, one count each of felonious assault, and firing across a public roadway with an agreed sentence of 18 to 25 years to life. However, during his testimony he did not remember the salient details of the incident. When shown a picture of Larissa's car, he claimed not to recognize it. The prosecution then asked him if viewing his video statement would refresh his recollection. The state then showed Taylor portions of his video statement in open court in front of the jury, without objection. After viewing those excerpts, Taylor indicated that they did not refresh his recollection. Taylor denied backing out of his plea agreement claiming that he simply did not remember what occurred due to the medications he was receiving in jail.

{¶ 20} In addition, the state presented text messages between Harris and Taylor. Two days before the shooting, the two discussed "sliding" which was defined as going to a neighborhood to either see who was there, or to fight, shoot, or kill "opps," i.e., people who are the opposite of them. In those texts, the two discussed whether Harris had enough bullets and whether he still had his gun. Harris indicated he had 15 bullets, and although his gun was not at his house, he could get

it if he needed to. Taylor texted Harris later asking why they did not "slide." Harris responded that there was no one outside and that he was sorry.

{¶ 21} In texts between Harris and Taylor a few hours after the shooting, Harris texted that six of the people on Buckeye were shot and one was dead. Taylor appears to compliment Harris by texting, "U my [n-word] fashooo [for sure]." The day after the shooting, Taylor texted Harris and told him that his uncle told him the kids on Buckeye had "snitched" on him. Harris texted back, telling Taylor not to mention his or Larissa's names.

{¶ 22} The state also presented text messages between Taylor and Larissa showing that he asked her to pick them up around 5:56 p.m. on November 24, 2018, appearing to confirm Shields's testimony.

{¶ 23} In addition to testimony, the state presented DNA linking Harris to the crime. Harris's DNA was found on several of the shell casings collected at the crime scene. However, it was determined that a crime scene detective had inadvertently transferred his DNA to some of the shell casings collected at the scene. The state addressed this problem in its case in chief, identifying the contaminated evidence and presenting evidence of uncontaminated casings containing Harris's DNA.

{¶ 24} A number of pictures and videos were introduced during the state's case in chief. One of the pictures was of a gun next to a baby's crib. The state introduced the picture and published it to the jury, without objection from the defense. The jury asked several questions about this picture, trying to determine if

the crib was for Larissa's daughter Skyla. After the state rested, the defense objected to that picture arguing it was confusing and unduly prejudicial. The trial court overruled the objection and admitted the picture into evidence.

{¶ 25} Harris then presented his case, challenging the DNA evidence and the crime scene investigation. Harris also suggested an alternate suspect for the crime, using the state's video evidence to identify another vehicle in the area. Harris suggested the driver was potentially involved in the shooting.

{¶ 26} After the submission of testimony, the jury ultimately found Harris guilty of the lesser included offense of murder under R.C. 2903.02(A) under Count 1, and guilty to Count 2, murder under R.C. 2903.02(B), Counts 3 through 7, attempted murder, Counts 8 through 14, felonious assault, Count 17, improper handling of a firearm in a motor vehicle, and guilty of the associated one-year and three-year firearm specifications. The jury found Harris not guilty of Count 1, aggravated murder, Count 15, felonious assault against Valonte McCord, and Count 16, discharge of a firearm on or near prohibited premises.

{¶ 27} The court found, and the parties stipulated that Counts 2, 8 (attempted murder of A.L.B.) and 14 (felonious assault of A.L.B.) were allied offenses of similar import to count one. Further, the court found that Counts 3 and 9; 4 and 10; 5 and 11; 6 and 12; and 7 and 13 are allied offenses of similar import to each other. The state elected to sentence on Counts 1 and 3 through 7.

{¶ 28} The trial court then sentenced Harris to an indefinite term of 15 years to life on Count 1 (murder) and three years on the merged firearms specifications;

four years each on Counts 3 through 6 (attempted murder); and seven years on Count 7 (attempted murder); three years each on the firearm specifications for Counts 3 through 7 to run concurrently to one another for a total of three years; one year on Count 17 and one year on the associated firearms specification. The trial court ordered the firearms specifications to be served consecutively, for a total of seven years, prior to the sentence on the remaining charges. The court ordered that the sentences on Counts 3 through 7 and Count 17 would run concurrently to one another for a total of seven years. The court further ordered that seven-year sentence to run prior to and consecutive to the term of 15 years to life.

{¶ 29} Harris appeals and assigns the following errors for our review.

### Assignment of Error No. 1

The trial court committed plain error in allowing the prosecutor to impeach co-defendants with their prior statements.

### Assignment of Error No. 2

Defense counsel rendered ineffective assistance in allowing the prosecutor to impeach co-defendants with their prior statements, in derogation of Defendant's rights under the 6th and 14th Amendments to the United States Constitution.

### Assignment of Error No. 3

The trial court erred in admitting a photograph of a firearm allegedly in a codefendant's possession, when the firearm was not the firearm used in the crime.

**Law and Analysis**

**Assignment of Error No. 1**

{¶ 30} In the first assignment of error, Harris argues that the trial court committed plain error when it allowed the state to impeach its own witnesses with prior recorded statements. The state ostensibly played the recordings in order to refresh the witnesses' recollection. Harris argues doing so led to improper impeachment of the witnesses.

**Standard of Review**

{¶ 31} The standard of review is whether the playing of the video statement before the jury was contrary to law. The parties agree that the standard of review for this assignment of error is abuse of discretion. Despite the parties' agreement, this court finds the agreement misplaced.

> "'The concept of 'abuse of discretion' as the basis for determining 'error' of the trial court connotes the right to exercise a sound discretion. * * * [W]here a specific action, ruling or order of the court is required *as a matter of law, involving no discretion*, the test of 'abuse of discretion' should have no application.'"

*Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 37, quoting *Rohde v. Farmer*, 23 Ohio St.2d 82, 89, 262 N.E.2d 685 (1970) (emphasis added).

**Publication of a Prior Recorded Statement to the Jury**

{¶ 32} Here the core issue is whether it was error for the state to play the video of the witnesses' statements in open court. The state alleged that it did so to refresh the witnesses' recollection. Harris argues that this was error and that the

video statements were not admissible for any other reason, such as, impeachment with a prior inconsistent statement. Because we find that it was error to play the videos in front of the jury to refresh recollection, we need not reach Harris's impeachment argument.

{¶ 33} In order to refresh a witness's recollection, "the witness looks at the prior statement to refresh his memory of the events, but then proceeds to testify from his present, independent knowledge." *State v. Webb*, 8th Dist. Cuyahoga No. 100487, 2014-Ohio-2644, ¶ 25, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 57, citing *State v. Scott*, 31 Ohio St.2d 1, 5-6, 285 N.E.2d 344 (1972). The testimony of the witness is the evidence; the out-of-court statement is not placed before the jury. *Id.*, citing *Powell* at ¶ 57. "'A party may not read the statement aloud, have the witness read it aloud, or otherwise place it before the jury.'" *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 57, quoting *State v. Ballew*, 76 Ohio St.3d 244, 254, 667 N.E.2d 369 (1996). The proper procedure when a videotape exists of a statement is to allow the witness to view the tape outside the presence of the jury, refreshing his recollection. *State v. Fair*, 2d Dist. Montgomery No. 24388, 2011-Ohio-4454, ¶ 59, citing *State v. Gunn*, 2d Dist. Montgomery App. No. 16617, 1998 Ohio App. LEXIS 3593 (Aug. 7, 1998).

> "The writing used to refresh the witness's recollection is not admitted into evidence unless admission is requested by the adverse party, and in any event has no substantive evidentiary significance." *Id.*, quoting *Dayton v. Combs*, 94 Ohio App.3d 291, 298, 640 N.E.2d 863 (1993).

*Id.*

{¶ 34} In the instant case, the state played Larissa's and Taylor's out-of-court video statements in front of the jury. While the defense alleges the state played the entire video statements, the state alleges that only a "snippet" was presented to the jury. The state did not introduce either video statement into evidence, so they are not part of the record. On the other hand, the defense did not object, nor seek to proffer the actual language of the video statements to allow this court to know what was heard. Nevertheless, the state alleged that the purpose of playing the video statements was to refresh the witnesses' recollection. As such, we assume that some substantive information was played, otherwise, how would the statement refresh the witnesses' recollection? Consequently, we view the trial court's decision to allow the presentation of the statements before the jury as a decision contrary to law, under *Johnson*. The trial court did not have the discretion to allow the video statements to be played in front of the jury to refresh the witnesses' recollection. The video statements should have been played outside the presence of the jury for the purpose of refreshing the witnesses' recollection.

{¶ 35} Nevertheless, Harris did not object to the introduction of this evidence. A failure to object waives all but plain error. Crim.R. 52(B); *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 28.

> To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial. *State v. Pratts*, 8th Dist. Cuyahoga No. 104235, 2016-Ohio-8053, ¶ 34, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). A defendant is entitled to a plain error finding where it is established that but for the error, the outcome of the trial clearly would have been different. *State*

> *v. Johnson*, 8th Dist. Cuyahoga No. 99715, 2014-Ohio-2638, ¶ 94, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978); *State v. Hill*, 92 Ohio St.3d 191, 749 N.E.2d 274 (2001). Even if the plain error standard is met, courts should only notice it "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long*, 53 Ohio St.2d at 91, 372 N.E.2d 804, paragraph three of the syllabus.

*State v. White*, 8th Dist. Cuyahoga No. 110452, 2022-Ohio-2130, ¶ 37

{¶ 36} When the accused fails to call an error to the court's attention by objecting, in order to obtain relief, he "is 'required to demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims.'" (Emphasis sic.) *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, ¶ 33, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860 ¶ 22, citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81-83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004).

{¶ 37} In the instant case, we are hampered by the absence of the video statements in the record. Nevertheless, after a thorough review of the record, we find there was ample evidence of Harris' guilt in the record, if believed by the jury. Shields identified Harris as one of the shooters. Harris' and Taylor's text messages from two days prior to the shooting confirm that they intended to commit a shooting in the area. They also exchanged texts after the shooting, praising the outcome. Although Larissa attempted to exonerate her brother, she admitted that she drove her brother, Shields, and Taylor to the Buckeye neighborhood on the date of the shooting. Pictures of her vehicle at the scene and cell phone records corroborate

that testimony. In addition, the cell phone records confirm that Larissa drove to the Buckeye area. They also show Harris leaving the scene. Finally, Harris' DNA was found on the shell casing located at the crime scene. While there were problems with evidence collection, there was no testimony that the evidence was tampered with or otherwise purposefully contaminated. Further, there was no evidence to contradict or challenge the finding of Harris' DNA on the casings.

{¶ 38} Based on the foregoing, the record fails to establish plain error that affected the result of the trial.

{¶ 39} Accordingly, Harris's first assignment of error is overruled.

## Assignment of Error No. 3

{¶ 40} In the third assignment of error, Harris argues that the trial court erred in admitting a photograph of a firearm allegedly in a codefendant's possession, when that firearm was not used in the crime. Harris argues that the evidence was not probative as to his guilt.

## Standard of Review

{¶ 41} The admission or exclusion of relevant evidence rests in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). A decision regarding the admission of evidence will not be overturned absent an abuse of discretion. *State v. Payne*, 8th Dist. Cuyahoga No. 107825, 2019-Ohio-4158, ¶ 38. A trial court abuses its discretion when it acts in an unreasonable, arbitrary, or unconscionable manner. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983.).

## Admissibility of Other Weapons Evidence

{¶ 42} Specifically, Harris is referencing a picture taken during the execution of a search warrant at codefendant Taylor's residence. State's exhibit No. 559 was a picture of a bedroom with a standard bed next to a baby's crib. Right next to the baby's crib was a black dresser with a firearm contained in the top drawer. Harris argues that there was no evidence linking this gun to the crime scene. Furthermore, the gun was not used in the shooting and could not be linked to the shell casings found on the scene.

{¶ 43} Pursuant to Evid.R. 401(A), evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The state argues that the picture was relevant evidence because it established that the state conducted a thorough investigation and that any firearms discovered were test fired. However, this argument fails. We are hard-pressed to see the relevance of a picture of a fireman, discovered in a codefendant's house next to a baby's crib when the weapon has no connection to this case. Therefore, the picture should not have been admitted. Evid.R. 402. *See also State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, ¶ 36 ("Federal and Ohio courts have recognized the introduction of other weapons evidence — i.e., irrelevant evidence of weapons unrelated to the charges — as error."). Consequently, it was an abuse of discretion for the trial court to admit the picture.

**{¶ 44}** Nevertheless, the Supreme Court has noted that where there is overwhelming independent evidence of guilt, the admission of other weapons evidence is harmless error. *State v. Thomas,* 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, ¶ 39.

**{¶ 45}** As we have already discussed, there was overwhelming evidence of Harris' guilt presented at trial. While it was an abuse of discretion to admit the picture, the admission was harmless as a matter of law.

**{¶ 46}** Accordingly, we overrule the third assignment of error.

## Assignment of Error No. 2

**{¶ 47}** Finally, in the second assignment of error, Harris argues that he received ineffective assistance of counsel when his lawyer allowed the state to impeach codefendants with prior statements.

## Standard of Review

**{¶ 48}** In order to establish a claim of ineffective assistance of counsel, Harris must demonstrate (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington,* 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, "'the failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 21, citing *In re S.A.*, 8th Dist. Cuyahoga No. 107707, 2019-Ohio-

4782, at ¶ 46, quoting *State v. Davenport*, 8th Dist. Cuyahoga No. 106143, 2018-Ohio-2933, ¶ 25, citing *Strickland* at 697.

**<u>Failure to Object to the Publication of Prior Statements to the Jury</u>**

**{¶ 49}** Licensed attorneys enjoy a strong presumption that they are competent. *State v. Scarton*, 8th Dist. Cuyahoga No. 108474, 2020-Ohio-2952, ¶ 89, citing *State v. Black,* 8th Dist. Cuyahoga No. 108001, 2019-Ohio-4977, ¶ 35, citing *State v. Smith,* 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). A reviewing court must give "great deference to counsel's performance and 'indulge a strong presumption' that counsel's performance 'falls within the wide range of reasonable professional assistance.'" *Id.*, citing *Strickland*, 466 U.S. at 689.

**{¶ 50}** Generally, trial counsel's tactical decisions and trial strategies, even if "debatable," do not constitute ineffective assistance of counsel. *Id.* at 90. Accordingly, a court of review "'will ordinarily refrain from second-guessing strategic decisions counsel [makes] at trial,' even where trial counsel's strategy was 'questionable.'" *Id.,* quoting *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 152; *State v. Mason*, 82 Ohio St.3d 144, 169, 694 N.E.2d 932 (1998); *State v. Quinones*, 8th Dist. Cuyahoga No. 100928, 2014-Ohio-5544, ¶ 25.

**{¶ 51}** "'One such tactical decision, is the decision to object.'" *Id.* at ¶ 95, citing *State v. Frierson*, 8th Dist. Cuyahoga No. 105618, 2018-Ohio-391, quoting *State v. Johnson*, 7th Dist. Jefferson No. 16 JE 0002, 2016-Ohio-7937, ¶ 46. A failure to object, by itself, is not sufficient grounds to sustain a claim of ineffective assistance of counsel. *Id.*

**{¶ 52}** Again, it is difficult to evaluate, in this case, whether defense counsel's decision was a tactical one. Having failed to preserve the video statement for our review, we must review the evidence in the record. Ineffective assistance of counsel requires a showing of both inadequate representation *and* prejudice. Prejudice, in this context, is a showing that the proceedings would have had a different outcome but for counsel's error. Consequently, there was ample evidence of Harris' guilt, notwithstanding the video statements, Harris has failed to establish prejudice.

**{¶ 53}** Accordingly, the second assignment of error is overruled.

**{¶ 54}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

MARY EILEEN KILBANE, P.J., and
LISA B. FORBES, J., CONCUR