[Cite as *State v. Steele*, 2025-Ohio-5766.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                             :

    Plaintiff-Appellee,          :

                      No. 114554

v.                                         :

JERMELLE STEELE,                           :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 24, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-674731-A

---

## *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey M. Maver and Eben O. McNair, Assistant Prosecuting Attorneys, *for appellee.*

Jaye M. Schlachet and Eric M. Levy, *for appellant.*

ON RECONSIDERATION[1]

EMANUELLA D. GROVES, J.:

{¶ 1} Pursuant to App.R. 26(A)(1), defendant-appellant Jermelle Steele has filed an application for reconsideration of this court's opinion in *State v. Steele*, 2025-Ohio-5133 (8th Dist.). The State did not file a response to Steele's application.

{¶ 2} The test for whether to grant a motion for reconsideration under App.R. 26(A)(1)(a) "'is whether the motion . . . calls to the attention of the court an obvious error in its decision or raises an issue for our consideration that was either not considered at all or was not fully considered by [the court] when it should have been.'" *State v. Robinson*, 2016-Ohio-2931, ¶ 2, quoting *State v. Dunbar*, 2007-Ohio-3261, ¶ 182. Steele argues that this court did not fully consider whether there was an irreconcilable conflict under R.C. 1.51 created by the State's decision to indict him for felonious assault under both R.C. 2903.11(A)(1) and 2903.11(A)(2), where that decision allowed the State to indict him on firearm specifications, and he became subject to an enhanced penalty by statute. We agree.

{¶ 3} Accordingly, we grant Steele's motion for reconsideration, vacate the earlier opinion and issue this opinion in its place. *See* App.R. 22(C).

---

[1] The original decision in this appeal, *State v. Steele,* 2025-Ohio-5133 (8th Dist.), released on November 13, 2025, is hereby vacated. This opinion, issued upon reconsideration, is the court's journalized decision in this appeal. *See* App.R.22(C); *see also* S.Ct.Prac.R. 7.01.

**Factual and Procedural History**

{¶ 4} In October 2022, a grand jury convened and issued a five-count indictment against Steele with respect to the death of 18-year-old Alan M. Warner ("Warner") on May 10, 2022, for aggravated murder, pursuant to R.C. 2903.01(A) (Count 1); murder, pursuant to R.C. 2903.02(A) (Count 2); murder, pursuant to R.C. 2903.02(B) (Count 3); felonious assault, pursuant to R.C. 2903.11(A)(1) (Count 4); and felonious assault, pursuant to R.C. 2903.11(A)(2) (Count 5). In addition, each count included one-year and three-year firearm specifications.

{¶ 5} Trial commenced in October 2024. Myracle Taylor ("Taylor"), who shared a daughter with Steele, testified on behalf of the State. On May 10, 2022, Taylor drove Steele around town in her car, while they both drank alcohol. At some point, Taylor took Steele to a family member's home. When she returned to get him five minutes later, he was accompanied by three individuals: "Ranbo" a.k.a. Jamir Steele ("Jamir") – Steele's cousin, "Zoo," and an unknown person. The four entered her car and asked her to take them to the rear of a Save-a-Lot Plaza.

{¶ 6} When she retrieved them later, Steele sat in the front passenger seat and the three young men sat in the rear. Shortly thereafter they noticed a young man riding a bicycle. Jamir told Steele, "[T]here he goes." Taylor testified that Steele exited her vehicle and started chasing the young man on the bicycle while shooting at him. Taylor followed him in her car and turned the headlights off because she did not want to be seen. Taylor denied having knowledge of what Steele planned to do.

**{¶ 7}** A neighbor testified that she went out on her porch that night to smoke a cigarette. She saw a neighbor was also outside smoking and walked over to greet her. From that neighbor's porch, she saw a boy peddling a bicycle really quickly down the street. She then saw a gray or silver Chevrolet turn the corner quickly and witnessed two individuals jump out of the car and chase after the boy on the bicycle. One of them was shooting while the other was not. When the shooting started the two neighbors dropped down to the floor of the porch. The neighbor saw someone get back into the Chevrolet as the car drove towards a nearby cemetery. She described the two people who exited the car as having similar features and builds, both were African-American men, around their mid-20s or early 30s, approximately 5'9" to 5'-10" tall, and between 120 and 135 pounds. The neighbor called 9-1-1 to report the incident.

**{¶ 8}** Taylor testified that after the shooting, Steele reentered her car. She took the three young men to Steele's sister's house and took Steele to his mother's house. Later, Taylor learned that the incident was reported on the Cleveland Remembrance Instagram page and that a description of her car was shown on another app discussing the crime. She testified that Steele helped her alter her car's appearance by removing a decal on the front windshield. She later repaired a taillight and replaced the hubcaps. She also testified that she and Steele hid in a hotel for a period of time to avoid the police.

**{¶ 9}** Cleveland Police Detective Richard Tusing ("Det. Tusing") testified that Taylor was identified as a person of interest rather quickly after the homicide

when a family member reported Taylor's involvement to the police. Taylor was brought in for questioning a couple of months after the homicide. She testified that during her first interview, she lied to the police, telling them that Steele stole her car but identifying him as the shooter. However, she denied any involvement. When confronted with evidence that placed her at the scene driving her car, Taylor gave a second statement admitting her involvement yet still implicating Steele as the shooter.

{¶ 10} During the course of the investigation, police acquired cell phone records from Taylor and Steele. Taylor identified the records, which included several text messages discussing the homicide. While Steele never admitted to being the shooter, he advised Taylor that he would help her obtain an attorney and advised her to lie to the police about what occurred that night. Taylor repeatedly raised concerns regarding the fact that police were on to her, while Steele continually advised her how to proceed. In a text message in June, Steele complained that Taylor kept threatening to "snitch" and told her there was no evidence against him unless she spoke. In September 2022, Taylor sent a text message to Steele that she had had enough and advised him that she had reported him to the police. The following day, Steele sent a text message to a female friend who lived out of town and asked if he could come stay with her.

{¶ 11} At trial, the State presented evidence that Steele and Taylor exchanged approximately 2,000 phone calls while Steele was in jail. In one of the calls played for the jury, Steele admonishes Taylor not to come down "here,"

presumably to the authorities because she was the only evidence against him. In a subsequent call, Steele told her he would admit to the charges but warned her that the media would be present in court. Taylor believed he mentioned the media because he knew she had a fear of being on camera.

{¶ 12} The State presented evidence establishing that Steele's DNA was found in the front passenger seat and the rear passenger area of Taylor's car. However, testimony and video established that Steele was in Taylor's car several times before and after the homicide. No other forensic evidence linked Steele to the crime.

{¶ 13} The jury ultimately found Steele not guilty of Counts 1 and 2, but guilty of all the remaining charges and associated firearm specifications. At the sentencing hearing, the trial court imposed a sentence of 21 years to life on Count 3. The court found that Counts 4 and 5 merged. The court further imposed the three-year firearm specification on Count 5 to run consecutively, for an aggregate term of 24 years to life. On October 30, 2024, the court issued a corrected journal entry regarding the verdict, which deleted the firearm specifications on Count 3. Simultaneously, the trial court issued a sentencing journal entry, which imposed a sentence of 21 years to life on Count 3. Therein the court found that Counts 4 and 5 merged and imposed a sentence on the three-year firearm specification to run consecutively to the base charge on Count 3.

{¶ 14} Steele filed a notice of appeal on November 15, 2024. Steele also filed for a limited remand to the trial court for resentencing to address or correct the

merger of offenses. The State agreed, and this court remanded the case for resentencing. The trial court held a sentencing hearing and found that Counts 3, 4, and 5 merge for purposes of sentencing and that the State elected to proceed with Count 3. The court then imposed a sentence of 15 years to life on the underlying offense and three years on the firearm specification. The court further imposed a three-year sentence on each of the firearm specifications associated with Counts 4 and 5 to be served prior to and consecutive to the firearm specification on Count 3 and consecutive to the underlying term, for an aggregate sentence of 24 years to life. The journal entry noted that although the defendant was found guilty of the one-year firearm specifications, no sentence was imposed. A nunc pro tunc entry was subsequently filed noting that Steele was acquitted of the remaining charges.

{¶ 15} Steele appeals raising the following assignment of error for our review.

### Assignment of Error No. 1

The trial court committed plain error when it entered a conviction against appellant for felony murder (B) in count three of the indictment after the jury entered a guilty verdict where the court failed to instruct it on the definition of proximate result, an essential element of the offense, prejudicing appellant and violating his constitutional right to due process of law.

### Assignment of Error No. 2

Appellant was denied his constitutional right to effective trial counsel where counsel failed to seek dismissal of the charge of felonious assault in violation of R.C. 2903.11(A)(1) charged in count four of the indictment, a general statute, when appellant was charged with felonious assault in violation of R.C. 2903.11(A)(2) in count five of the indictment, a specific statute, for the same act in violation of R.C. 1.51

and appellant was prejudiced where he was subject to the imposition of an additional three-year firearm specification at sentencing pursuant to count four which should have been dismissed prior to trial.

## Assignment of Error No. 3

The trial court erred and abused its discretion where, over objection of appellant, it permitted the State to comment in closing argument that appellant failed to call a witness to prove his innocence improperly vouching for the credibility of its own witness and shifting the burden of proof to appellant.

## Assignment of Error No. 4

Appellant was convicted of felony murder (B) and two counts of felonious assault for the same act against the manifest weight of the evidence.

## Law and Analysis
## Jury Instructions

{¶ 16} In the first assignment of error, Steele argues that the trial court plainly erred when it failed to instruct the jury on the definition of "proximate result" in Count 3, murder pursuant to R.C. 2903.02(B). Steele argues that he was prejudiced by this omission because "proximate result" was a disputed issue and the failure to instruct on a disputed issue demonstrates prejudice. Further, Steele argues that even if this court disagrees and fails to find plain error, he received ineffective assistance of counsel when his lawyers failed to object to the absence of the jury instruction. Steele's arguments are not well taken.

{¶ 17} A party is required to raise any objections to the jury instructions "before the jury retires to consider its verdict." Crim.R. 30(A); *State v. Ruediger*, 2024-Ohio-1975, ¶ 91 (8th Dist.). Absent a timely objection, the party "'waives all but plain error.'" *Id.,* quoting *State v. Owens*, 2020-Ohio-4616, ¶ 7. Additionally,

the mere failure of a court to "'separately and specifically instruct the jury on every essential element of each crime with, which an accused is charged does not *per se* constitute plain error under Crim.R. 52(B).'" (Emphasis in original.) *State v. Blackburn*, 2003-Ohio-605, ¶ 14 (11th Dist.), quoting *State v. Adams*, 62 Ohio St.2d 151 (1980), paragraph two of the syllabus. An appellant establishes that they were prejudiced by a trial court's plain error by demonstrating that but for the trial court's error, the outcome of the trial would have been different. *Id*. at ¶ 13, citing *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus.

{¶ 18} In order to prove murder under R.C. 2903.02(B), the State must establish that the defendant caused "the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree. . . ." In the instant case, the trial court did not include a definition of "proximate result" in its jury instruction for Count 3, murder. The Ohio Supreme Court has recognized that "proximate result" is the same as "proximate cause." *State v. Crawford*, 2022-Ohio-1509, ¶ 15, citing *State v. Carpenter*, 2019-Ohio-58, ¶ 51 (3d Dist.); *see also Owens* at ¶ 9. Proximate cause requires a determination of whether ""'the harm alleged [has] a sufficiently close connection to the conduct" at issue.'" *Id*., quoting *Robers v. United States*, 572 U.S. 639, 645 (2014), quoting *Lexmark Internatl., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). That is,

> "'[i]n order for a criminal defendant's conduct to be the proximate cause of a fatal result in a felony murder case, the court must first determine whether the killings would not have occurred "but for" the

defendant's conduct. The court must then determine whether the result varied greatly from the intended outcome or foreseeable result of the underlying crime . . . .'"

*State v. Williams*, 2020-Ohio-4430, ¶ 36 (7th Dist.), quoting *State v. Franklin*, 2008-Ohio-2264, ¶ 120-121 (7th Dist.), quoting *State v. Franklin*, 2008-Ohio-462, ¶ 25 (10th Dist.).

{¶ 19} Steele argues that the failure to define "proximate result" caused prejudicial error where the court referred the jury to a previous definition of "cause" where "cause" was defined twice and the court did not provide guidance on which definition to use. Further, Steele contends prejudice ensued because "proximate result" was a disputed issue and the failure to instruct was per se prejudicial.

{¶ 20} With respect to the two definitions of "cause," the trial court defined the word relative to aggravated murder and relative to murder pursuant to R.C. 2903.02(A). Contrary to Steele's assertion, the trial court's instructions were similar. For aggravated murder, the trial court defined "cause" as "an act, which directly produces the death of another and without, which it would not have occurred." For murder, the court defined "cause" as "an act, which in a natural and continuous sequence directly produces the death of [Warner] and without which it could not have occurred." The trial court further stated:

> The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act or failure to act. Defendant is also responsible for the natural and foreseeable consequences or the results that follow in the ordinary course of events from the act or failure to action.

{¶ 21} Nevertheless, Steele does not point to any evidence in the record to support his argument that the jury was confused by the two definitions, such that they erred in finding Steele guilty. Moreover, the facts in this case were straightforward and, contrary to Steele's assertion, proximate result was not a contested issue. Steele's argument at trial was that Taylor lied and implicated him as the shooter to protect someone else, potentially a family member or friend. The undisputed evidence at trial was that someone chased Warner down and shot him. Warner's death was the proximate result of the shots fired. Ultimately, the jury determined Steele was the shooter. Because Steele has failed to establish how he was prejudiced by the trial court's omission, he has failed to establish plain error.

{¶ 22} Finally, Steele argues that if this court finds that the trial court did not plainly err, he received ineffective assistance of counsel when his attorney failed to object to the omitted instruction. However, in order to establish ineffective assistance of counsel, as discussed further below, a defendant must establish both that his lawyer's performance was deficient and that, but for the lawyer's performance, the outcome of the trial would have been different, i.e., that he was prejudiced by the performance. *State v. Farraj*, 2025-Ohio-2778, ¶ 22 (8th Dist.). We need not address Steele's lawyer's performance because Steele has failed to establish he was prejudiced; thus his ineffective assistance claim fails.

{¶ 23} Accordingly, the first assignment of error is overruled.

**Ineffective Assistance of Counsel**

{¶ 24} In the second assignment of error, Steele argues that he received ineffective assistance of counsel when his lawyer failed to move to dismiss the felonious assault serious physical harm charge in Count 4, which Steele claims is a general statute. Steele argues that the State was only permitted to proceed on the specific, i.e., special statute under Count 5, felonious assault deadly weapon, pursuant to R.C. 1.51. Steele's argument hinges on the enhanced penalty that applies to the facts of this case pursuant to R.C. 2929.14(B)(1)(g). In the alternative, Steele argues that if counsel was not ineffective, it was plain error to proceed on Count 4 of the indictment. Steele's argument lacks merit.

{¶ 25} When reviewing a claim of ineffective assistance of counsel, this court must determine whether counsel's performance has """fallen below an objective standard of reasonable representation and [that] prejudice arises from counsel's performance."" *State v. Gilmer*, 2022-Ohio-821, ¶ 11 (8th Dist.), quoting *State v. Sims,* 2021-Ohio-4009*,* ¶ 21, quoting *State v. Bradley*, 42 Ohio St. 3d 136 (1989), paragraph two of the syllabus. Both elements must be proven to prevail on a claim of ineffective assistance of counsel. *See State v. Harris,* 2022-Ohio-4630, ¶ 48 (8th Dist.). In the context of a motion, a defendant establishes prejudice when he demonstrates that the trial court would have granted the motion if appropriately raised. *See State v. Wilson,* 2019-Ohio-2741, ¶ 9 (8th Dist.) (addressing a motion to dismiss for a speedy-trial violation); *State v. Conkright*, 2007-Ohio-5315, ¶ 50 (6th Dist.) (finding that a defendant demonstrates prejudice when his counsel fails to file

a motion to suppress if the record establishes the motion would have been granted if filed).

{¶ 26} "Licensed attorneys enjoy a strong presumption that they are competent." *Harris* at ¶ 49, citing *State v. Scarton*, 2020-Ohio-2952, ¶ 89 (8th Dist.), citing *State v. Black*, 2019-Ohio-4977, ¶ 35 (8th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). Accordingly, an appellate court gives "'great deference to counsel's performance and "[indulges] a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance."'" *Id.,* quoting *Scarton*, quoting *Strickland v. Washington,* 466 U.S. 668, 689 (1984).

{¶ 27} Having set out the standard for an ineffective assistance claim, we turn to whether a motion to dismiss Count 4 pursuant to R.C. 1.51 would have been successful. "It is a well-established principle of statutory construction that specific statutory provisions prevail over conflicting general statutes." *State v. Chippendale*, 52 Ohio St.3d 118, 120 (1990), citing *State v. Volpe*, 38 Ohio St.3d 191, 193 (1988). This principle is codified in R.C. 1.51, which states:

> If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail.

{¶ 28} First we must determine whether the statutes in question are general, specific, or local. *Chippendale* at 120. If both statutes are general and "do not involve the same or similar offense, then R.C. 1.51 is inapplicable." *Id.* In contrast,

if one statute is general and the other is specific, and "they involve the same or similar offenses, we then look to see if the offenses are allied offenses of similar import." *Id.*[2] We determine whether offenses are allied offenses of similar import by looking at the import, conduct, and animus. *State v. Collier*, 2020-Ohio-3033, ¶ 34 (8th Dist.), citing *Ruff* at ¶ 25. The offenses are not allied offenses of similar import and do not merge

> if any of the following are true (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

*Id.,* citing *id.*

{¶ 29} The tenets of R.C. 1.51 do not come into play unless "a general and a [specific] provision constitute allied offenses of similar import and additionally do not constitute crimes committed separately or with a separate animus for each crime." *Chippendale* at 120.

{¶ 30} When R.C. 1.51 applies, the first step is determining whether the statutes of concern present an irreconcilable conflict. *State v. Hardy*, 2017-Ohio-7635, ¶ 49, (2d Dist.). When considering related statutes, we ""must harmonize and give full application to all . . . statutes [concerning the same subject matter] unless they are irreconcilable and in hopeless conflict."" (Brackets in original.) *State v. Pribble,* 2019-Ohio-4808, ¶ 12, quoting *United Tel. Co. of Ohio v. Limbach*, 71 Ohio

---

[2] *Chippendale* utilized a test for allied offenses of similar import that has since been overruled by the Ohio Supreme Court in favor of the test utilized in *State v. Ruff*, 2015-Ohio-995.

St.3d 369, 372 (1994), quoting *Johnson's Mkts., Inc. v. New Carlisle Dept. of Health*, 58 Ohio St.3d 28, 35 (1991); *State v. Cook*, 2010-Ohio-6305, ¶ 45. An irreconcilable conflict exists "when the same conduct receives different penalties under two different statutes." *Hardy* at *id.*, citing *Chippendale,* 52 Ohio St.3d at 120. If the statutes are irreconcilable, the specific provision prevails over the general one, unless it is clear that the general provision applies coextensively with the specific provision. *Chippendale* at 120-121. Where the general provision applies coextensively with the specific provision, the State may charge the offender with both crimes. *Id.* at 121. Where it does not, then the State may only charge the offender with the specific provision. *Id.*

{¶ 31} Applying the foregoing analysis to this case, we must determine whether the statutes are general, specific, or local. "'The common meaning of "general" is that which is "'universal, not particularized as opposed to special.'"'" *State v. Poupard*, 2018-Ohio-777, ¶ 26 (6th Dist.), quoting *State v. Conyers*, 87 Ohio St.3d 246, 250 (1999), quoting *Black's Law Dictionary* (6th Ed. 1990). Here, R.C. 2903.11(A)(1) provides that a person commits felonious assault when they knowingly cause serious physical harm to another person or another's unborn. The language is broad and can encompass multiple ways to cause serious physical harm, including the use of a deadly weapon or dangerous ordnance. *See Conyers*, at 250 (finding that the escape statute in former R.C. 2921.34(A)(1) was general because it broadly defined the crime and did not, by its own language, limit its application). R.C. 2903.11(A)(2), in contrast, requires that the person knowingly cause or attempt

to cause physical harm to another or to another's unborn using a deadly weapon or dangerous ordnance. By its language, R.C. 2903.11(A)(2) only applies when a deadly weapon or dangerous ordnance is used and does not require evidence of serious physical harm. In this context, R.C. 2903.11(A)(1) is general while R.C. 2903.11(A)(2) is specific.

{¶ 32} Next we determine whether the offenses are allied offenses of similar import. Here, the trial court found that they were and merged the two with the murder charge in Count 3. We agree that the actions held the same import and were committed with the same animus and the same conduct.

{¶ 33} Based on the foregoing, R.C. 1.51 applies and we must consider whether the two statutes are irreconcilable, i.e., whether they impose different sentences for the same conduct. The facts of this case fit the elements of both R.C. 2903.11(A)(1) and (A)(2). Moreover, the penalty for the two statutes are the same; accordingly, they are not irreconcilable.[3] Steele argues that the two felonious-assault statutes are irreconcilable because of the differences in the elements. This argument is unpersuasive. As we have noted, once it is determined that an appellant's conduct can be charged under two statutes, as occurs here, the statutes are only irreconcilable if they call for different penalties.

---

[3] The only difference in penalties is that the court may impose a driver's license suspension if a person convicted under R.C. 2903.11(A)(2) uses a motor vehicle as a deadly weapon or dangerous ordnance, which is not at issue in this case. R.C. 2903.11(D)(4).

{¶ 34} Furthermore, although Steele focuses on the felonious-assault offenses, Steele's argument is not based on their irreconcilability with one another; rather, Steele is arguing that the attendant firearm specifications and the enhanced penalty in R.C. 2929.14(B)(1)(g) causes a conflict under R.C. 1.51. We disagree.

{¶ 35} A firearm specification is a penalty enhancement and not a criminal offense, because it does "'not contain a positive prohibition of conduct.'" *State v. Beatty*, 2024-Ohio-5684, ¶ 21, quoting *State v. Ford*, 2011-Ohio-765, ¶ 16, 19; R.C. 2901.03(B) ("An offense is defined when one or more sections of the Revised Code state a positive prohibition or enjoin a specific duty, and provide a penalty for violation of such prohibition or failure to meet such duty."). Notably, an offender may commit both versions of the felonious-assault statute without using a firearm. Steele is subject to penalty enhancements because he used a firearm, not because he was charged with two counts of felonious assault. The penalty enhancements reflect the legislature's intention to impose additional penalties on offenders who use firearms, and when they do so in the commission of multiple felonies. *See Beatty* at ¶ 22; *State v. Bollar*, 2022-Ohio-4370, ¶ 20, (discussing R.C. 2929.14(B)(1)(g) and noting that "the General Assembly appears to have acknowledged that the use of firearms in certain violent crimes should carry a hefty penalty.").

> Although prison terms imposed for firearm specifications are punishments that are attached to underlying offenses, they are not themselves "prison terms . . . imposed on an offender for convictions of . . . offenses[.]" R.C. 2929.14(C)(4).

*Id.*

{¶ 36} Finally, Steele argues that the rule of lenity applies and should prevent the imposition of two three-year prison terms as a result of the two firearm specifications attached to the two merged felonious-assault counts. The rule of lenity states "that a court will not interpret a criminal statute so as to increase the penalty it imposes on a defendant if the intended scope of the statute is ambiguous." *State v. Pribble*, 2019-Ohio-4808, ¶ 22, citing *State v. Elmore*, 2009-Ohio-3478, ¶ 38. However, the rule only applies, if after applying the regular rules of statutory construction, "'"there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended."'" *Id.* at ¶ 23, quoting *Abramski v. United States*, 573 U.S. 169, 188, fn. 14, (2014), quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013). We find no such ambiguity here; accordingly, the rule does not apply.

{¶ 37} Therefore, the State was permitted to charge Steele with both felonious-assault offenses. *See* R.C. 2941.25 ("Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one").

{¶ 38} Based on the foregoing, Steele's lawyer would not have prevailed if he filed a motion to dismiss Count 4 of the indictment prior to trial. Steele was not entitled to dismissal under R.C. 1.51. Accordingly, the claim of ineffective assistance of counsel fails. Additionally, Steele's plain-error argument fails because it also requires evidence that there was an error that effected a substantial right. Crim.R.

52(B). Because there was no error, there was no plain error. Thus, the second assignment of error is overruled.

**Commentary on a Party's Failure to Call a Witness**

{¶ 39} In the third assignment of error, Steele argues that the trial court abused its discretion when it allowed, over objection, the prosecution to comment on Steele's failure to present a witness at trial. Steele argues that the State's action improperly shifted the burden of proof to him and implied that he was required to prove his innocence. We disagree.

{¶ 40} It is well settled that a party may "'comment that a witness other than the accused did not testify, since the prosecution may comment upon the failure of the defense to offer evidence in support of its case.'" *State v. Tate*, 2011-Ohio-69, ¶ 22 (8th Dist.), quoting *State v. Clemons*, 82 Ohio St.3d 438 (1998), citing *State v. D'Ambrosio*, 67 Ohio St.3d 185, 193 (1993); *State v. Williams*, 23 Ohio St.3d 16, 19-20 (1986); and *State v. Bies*, 74 Ohio St.3d 320, 326 (1996). "'The fact that one of the parties fails to call a witness who has some knowledge of the matter under investigation may be commented upon.'" *D'Ambrosio* at 193, quoting *State v. Petro*, 148 Ohio St. 473, 498 (1948); *State v. Champion*, 109 Ohio St. 281, 289-290 (1924).

{¶ 41} In the instant case, Taylor alleged that Steele's cousin, Jamir, was in the backseat of her car throughout the incident. During Det. Tusing's cross-examination, the defense specifically asked him whether he had information on the three young men in the backseat of Taylor's car and whether he attempted to talk to them. With respect to Jamir, Det. Tusing testified that he had attempted to talk to

him, but Jamir had a pending case and his lawyer advised the detective that he was unwilling to give a statement. Nevertheless, it was clear that the defense's strategy was to call into question the investigation and why certain avenues were not explored. During its questioning, the defense highlighted that during the course of the investigation police obtained the names of several potential suspects and discussed what, if anything, the police did to investigate. As a result of the defense's strategy, the State requested permission to argue that the defense failed to call Jamir as a witness to support their case. The defense objected. After listening to the argument of counsel and reviewing case law, the trial court overruled the objection.

{¶ 42} In closing argument, the defense challenged Taylor's credibility and argued that the police ignored promising leads because they chose to believe Taylor. They argued that the State obtained three names from Taylor; people close to Warner named two potential suspects; and someone called the police and claimed someone named "Rayshawn" was the shooter; and yet the police failed to investigate any of those leads. The defense pointed out that Jamir a.k.a. "Ranbo" was in the car and the police learned his real name and where he lived, but Det. Tusing decided not to talk to him because he was a suspect. In challenging Taylor's credibility, the defense argued that Taylor said Jamir was in her car and yet Jamir's DNA was not found in Taylor's car.

{¶ 43} In the rebuttal close, the State remarked:

State: And I want to be very careful and clear of what I'm saying next. I do not in any way want to shift the burden on the defense. They have

no burden at all in this case. The entire burden of production of evidence and persuasion only sits at these tables.

But I do find it terribly interesting that [Taylor] gave this supposed series of lies. And what they will have you believe is a series of lies she inserted into the fact that his blood relative, Jamir Steele, was also present in the car. Now Jamir did not want to talk to Detective Tusing because the detective had to get a search warrant just to run a Q-tip on the inside of his cheeks.

Jamir obviously saw fit to come and observe these proceedings —

Defense:  Objection.

Court:  Ladies and gentlemen, I remind you that counsel have a broad latitude to offer the arguments that they believe will be persuasive to you and to help you interpret the case. It is entirely up to you what the facts in this case are.

State:  If she's telling you a lie, why is she inserting into that lie a person who could very clearly exonerate Mr. Steele if what she said was not the truth right? Jamir could come in at any moment and say, that's not what happened, she did not pick us up that night. Or [Steele] wasn't the one that got out of the car, it was one of the other people who she picked up with me.

If she's fabricating a lie, why is she including into that lie at the very core someone who could completely unravel this entire case with just a few words. Because what she told you is not a lie, what she told you is the absolute truth.

{¶ 44} The prosecution only highlighted the fact that a witness existed who could refute Taylor's narrative, that that witness was related to Steele, and that Steele failed to call him to testify. Furthermore, to the extent that the defense argues the prosecutor vouched for Taylor's testimony, we disagree. A prosecutor vouches for a witness at trial when he "'implies knowledge of facts outside the record or places his or her personal credibility in issue.'" *State v. Walker*, 2022-Ohio-1238, ¶ 41 (8th Dist.), quoting *State v. Myers*, 2018-Ohio-1903, ¶ 145. Accordingly, "'[a]n

attorney may not express a personal belief or opinion as to the credibility of a witness.'" *Id.*, citing *id.* A prosecutor may, however, comment on the credibility of a witness based on their in-court testimony. *Id.*, citing *State v. Price*, 60 Ohio St.2d 136, 140 (1979). Here, the prosecutor pointed out that it would be odd for Taylor to tell a lie that included one of Steele's family members, who, if called as a witness could refute her testimony. Given this context, the State argued Taylor's testimony was truthful.

{¶ 45} Based on our review of the record, we find that the trial court did not err when it allowed the prosecutor to remark on the defense's failure to call a witness with knowledge of the incident. Further, the prosecutor did not vouch for Taylor, rather he pointed out that her testimony was truthful because it was unlikely she would randomly include someone who could expose a lie if called to the stand by the defense.

{¶ 46} Accordingly, the third assignment of error is overruled.

**The Weight of the Evidence**

{¶ 47} In his fourth assignment of error, Steele argues that his convictions were not supported by the greater weight of the evidence. In this argument, Steele focuses on Taylor's credibility, as well as the failure of the police to sufficiently investigate leads that arose during the course of the investigation. We find Steele's argument unpersuasive.

{¶ 48} The weight of the evidence relates to "'the evidence's effect of inducing belief.'" *State v. Harris*, 2021-Ohio-856, ¶ 32 (8th Dist.), quoting *State v.*

*Wilson*, 2007-Ohio-2202, ¶ 25, citing *State v. Thompkins*, 78 Ohio St. 3d 380, 386-387 (1997). An appellate court reviewing the weight of the evidence must consider all of the evidence in the record, the reasonable inferences to be made from it, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983).

{¶ 49} The undisputed evidence in this case is that someone chased down and killed Warner. The main question for the jury was whether Steele was the perpetrator, and Taylor was the only witness to provide direct evidence of Steele's involvement. Nevertheless, the defense argued and the trial court agreed that the jury should be instructed on accomplice testimony. Therefore, the court instructed the jury that it was up to them to determine whether Taylor was an accomplice and that if she was, they should view her testimony with great caution and grave suspicion. A jury is presumed to follow the instructions given to it by a trial judge. *State v. Gray,* 2020-Ohio-1402, ¶ 16 (2d Dist.), citing *State v. Jones*, 90 Ohio St.3d 403, 414 (2000). Regardless of whether the jury found that Taylor was an accomplice, the trial court's instruction put the jurors on notice that the credibility of her testimony should be given heightened scrutiny.

{¶ 50} Looking to Taylor's testimony, Taylor admitted at the outset that she lied to police. However, she consistently maintained that Steele was the shooter. Steele points to the fact that Taylor never mentioned that her uncle was in the car

that night. However, the evidence establishes that her uncle was in the car two-three hours before the incident and there was no evidence that he was in the car at the time of the shooting. Steele also points to the failure of the police to investigate suspects that were identified the night of the incident. However, the record shows the police did follow up on these leads. Det. Tusing attempted to speak to Jamir. Another detective followed up on a statement that someone had shot at Warner several months prior to the incident and noted it in his report. Rather than displaying a lack of investigation on the part of the police, the record displayed their investigation of leads ultimately led to Taylor and identified Steele as the perpetrator.

{¶ 51} Furthermore, there was evidence that Steele participated in acts to cover up the crime after it occurred. Taylor testified that Steele told her to remove the decal on the front of her car after they both learned that her car appeared in a video surrounding the homicide. When Taylor's vehicle was found, the decal had been removed. Taylor hid at a hotel with Steele for two days after the murder, then she hid at her aunt's house because the police were looking for her. The police eventually found Taylor in July and brought her in for an interview. She sent text messages to Steele from the back of the police cruiser upset because she was going to be charged with a crime for someone he killed. Taylor deleted the text messages but the police were able to recover them. At first, Steele promised that he would take responsibility for the crime. Then Steele complained that Taylor was trying to take him from his little girl by implicating him. In subsequent texts, Steele complained

that Taylor was constantly threatening to "snitch" on him and mentioned that she was the only evidence against him.

{¶ 52} In addition to Taylor's testimony, there were jail calls where the two discussed the crime. Steele never admitted his involvement but he and Taylor engaged in multiple conversations discussing the homicide. During one conversation, he told her not to come down "here" because she was the only evidence against him. During another, Steele, from Taylor's perspective, raised issues that would frighten her and prevent her from appearing in court, i.e., the presence of the media.

{¶ 53} Based on the foregoing, we do not find that the convictions were against the manifest weight of the evidence. The jury did not lose its way or create a manifest miscarriage of justice. Accordingly, the fourth assignment of error is overruled.

{¶ 54} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

MICHELLE J. SHEEHAN, P.J., and
MARY J. BOYLE, J., CONCUR